*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0014p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JOE A. PENNINGTON,

   *Plaintiff-Appellant,*

    *v.*

METROPOLITAN GOVERNMENT OF NASHVILLE AND
DAVIDSON COUNTY; JOSEPH BISHOP, individually;
and MICHAEL T. HAGAR, individually,

      *Defendants-Appellees.*

No. 07-5180

>

---

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 05-01075—Robert L. Echols, District Judge.

Argued: November 2, 2007

Decided and Filed: January 10, 2008

Before: SILER, MOORE, and GILMAN, Circuit Judges.

---

### COUNSEL

---

**ARGUED:** Phillip L. Davidson, Nashville, Tennessee, for Appellant. Francis H. Young, METROPOLITAN DEPARTMENT OF LAW, Nashville, Tennessee, for Appellees. **ON BRIEF:** Phillip L. Davidson, Nashville, Tennessee, for Appellant. Francis H. Young, METROPOLITAN DEPARTMENT OF LAW, Nashville, Tennessee, for Appellees.

---

### OPINION

---

  RONALD LEE GILMAN, Circuit Judge. Joe A. Pennington, a Metropolitan police officer, was off duty when he became involved in an altercation at a Nashville bar. Deputy Chief Joseph Bishop and Captain Michael Hagar later requested Pennington to submit to a breathalyzer test. Pennington agreed to take the test because he was afraid that he would be terminated or suspended if he failed to comply. He subsequently sued Bishop, Hagar, and the Metropolitan Government of Nashville and Davidson County on the basis that he was unlawfully required to take the breathalyzer test in violation of his constitutional rights. The district court granted judgment in favor of the defendants. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

# I. BACKGROUND

## A.    Factual background

On December 25, 2004, Pennington was not on active assignment. He and his date met two of his high school friends at the Red Iguana, a bar in downtown Nashville, between 9:00 and 10:00 p.m. Pennington testified at his deposition that he had four or five Bud Lights throughout the evening, but on the night in question he told Sergeant Johnathan Rogers that he drank seven beers at the bar.

Sometime after midnight, while still at the bar, Pennington's friends became involved in an altercation with other patrons. Security guards on the premises attempted to break up the fight. Because Pennington thought that the guards were using excessive force on one of his friends, he intervened to help the friend. The security guards then attempted to grab Pennington. He struggled against the guards' attempts to subdue him and eventually identified himself as a police officer. The fight immediately stopped and Pennington and his friends were escorted out of the bar. Once outside, the manager informed Pennington and his friends that one of the other individuals had identified himself as a police officer and that no one could leave until the police arrived. Pennington told the manager that he was a police officer and that he did not recognize any of the other individuals as a fellow officer. When the manager asked to see Pennington's credentials, Pennington presented his badge and police commission card.

Sergeant Rogers was the first police officer on the scene. Pennington knew Rogers because the two men had previously worked together. Rogers asked Pennington what had happened, and Pennington gave his account of the altercation. Captain Hagar arrived on the scene as Sergeant Rogers was interviewing the other witnesses who were standing on the sidewalk.

After gathering the basic facts of the incident, Hagar spoke with Pennington, who appeared "red-faced." Hagar testified at his deposition that he "attributed some of that to the drinking and some of that to having been in an altercation." Pennington informed Hagar that he had pushed the security guards before identifying himself as a police officer. According to Hagar, Pennington was generally cooperative throughout the entire incident. There were two simultaneous investigations going on, one a criminal investigation handled by Sergeant Rogers and the other an administrative investigation handled by Hagar.

After determining that Pennington had been drinking, was involved in a fight, and had identified himself as a police officer, Hagar contacted Pennington's supervisor, Acting Captain Shawn Parris. Parris suggested that Hagar call Assistant Chief Bishop. Hagar explained the situation to Bishop and asked Bishop if a breathalyzer test should be administered to Pennington. Based on Pennington's apparent intoxication, involvement in the fight, and having identified himself as a police officer, Bishop agreed that Pennington should take a breathalyzer test. Bishop further stated that if Pennington did not voluntarily submit to the breathalyzer test, Hagar should "give him an order to take the breath test as an administrative process within our policy."

Although there is no written policy that prohibits an intoxicated police officer from identifying himself as such, Bishop said that there is a policy "that when . . . officers invoke their authority, that they be subject to all of the policies and procedures of the police department, one of which is not being intoxicated." Hagar testified that the reason for the breathalyzer test was to protect the department and Pennington "against allegations of misconduct, wrongdoing on the part of an officer."

According to Hagar, he returned to Pennington after speaking with Bishop and said:

> Your chain of command has been notified. . . . It's going to be investigated. You know the fact that you have been drinking is going to be an issue. . . . That should not cloud the issue of what happened here. You can take a breath test. We can put that all out of the way. There will be no doubt; nobody can ever question how much you had to drink, how drunk you were or anything. . . . You can volunteer to do this.

Hagar claims that Pennington agreed to take the test. The only time Pennington became angry, according to Hagar, was when they discussed what to do with Pennington's date. The matter was resolved by Hagar's hailing a cab for Pennington's date and allowing Pennington to talk to her and put her in the cab.

Pennington disputes that he voluntarily submitted to the breathalyzer test. According to Pennington, when Hagar brought up the breathalyzer test,

> I made the statement that I don't agree with this, that I don't think there is any legal grounds on this. I was told that I was given a direct order, and that I would go to Central Station per Chief Bishop and take a breathalyzer, and there would be no further discussion or [I would] face termination and discipline.

Pennington further stated that "[a]t the time of that incident, I didn't know if I was being investigated for criminal charges or disciplinary charges. I was told that if I [didn't] go to Central Station and take a breathalyzer, I would face termination or suspension."

Hagar decided to have the breathalyzer test administered at Central Station to avoid the crowd that had gathered on the street in front of the bar. Sergeant Rogers offered to drive Pennington in Rogers's squad car. Hagar informed the officers that "[h]e's not going to sit in the back. He is not going to be handcuffed. He's not under arrest. He's cooperative." The breathalyzer test was administered in the back seat of a DUI police car in the parking lot of Central Station. Pennington registered a .121 breath alcohol level.

Following the administration of the breathalyzer test, Hagar asked Pennington to write out a statement regarding the incident. Pennington requested permission to delay writing out the statement because he did not want to "write out a statement that was going to be misspelled and garbled" due to his intoxication. Hagar then asked Rogers to drive Pennington home and ordered Pennington to submit his written report at the start of his shift the following day.

After an internal investigation into the incident, the Metropolitan Police Department determined that Pennington had not violated any departmental policies or regulations. Pennington later received informal verbal counseling from his supervisor.

## B.    Procedural background

Based on the foregoing facts, Pennington sued Bishop, Hagar, and the Metropolitan Government pursuant to 42 U.S.C. § 1983. Pennington alleged that Bishop and Hagar violated his rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments by ordering him to take a breathalyzer test. He also claimed that the Metropolitan Government permitted, encouraged, and tolerated an official pattern, practice, or custom of its law enforcement officers administering the breathalyzer test in a manner that violated his constitutional rights.

Bishop, Hagar, and the Metropolitan Government filed a joint motion to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, contending that Pennington had failed to state a claim upon which relief can be granted. The district court granted the motion as to Pennington's Fifth and Sixth Amendment claims and on his Fourteenth Amendment equal-protection claim. It denied the motion regarding the remaining claims.

The defendants subsequently filed a motion for summary judgment on Pennington's Fourth Amendment claim and his Fourteenth Amendment due process claim, alleging that they had not violated Pennington's constitutional rights and that, in the alternative, the individual defendants were entitled to qualified immunity. The district court granted the motion for summary judgment, finding that Pennington's breathalyzer test did not constitute an unconstitutional seizure, that Bishop and Hagar would be entitled to qualified immunity in any event, and that the claim against the Metropolitan Government was without merit because the claims against the individual defendants failed. Pennington then filed the present appeal, arguing that the district court erred in granting summary judgment to Bishop and Hagar. He does not appeal the grant of summary judgment to the Metropolitan Government.

## II. ANALYSIS

### A.    Standard of review

We review de novo a district court's grant of summary judgment. *Int'l Union v. Cummins*, 434 F.3d 478, 483 (6th Cir. 2006). Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the district court must construe all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251-52 (1986).

### B.    Constitutionality of the breathalyzer test as applied to Pennington

On appeal, Pennington argues that the district court erred by granting Bishop's and Hagar's motion for summary judgment. The defendants contend that the only real issue on appeal is whether there was a violation of Pennington's constitutional rights, because if his rights were not violated, then he has no claim under § 1983. Section 1983 "prohibits actions 'under color of state law' which deprive an individual of a right secured by the U.S. Constitution or a federal statute." *Cherrington v. Skeeter*, 344 F.3d 631, 644 (6th Cir. 2003).

"[T]he Constitution forbids . . . not all searches and seizures, but unreasonable searches and seizures." *Terry v. Ohio*, 392 U.S. 1, 9 (1968). A person is seized when "a reasonable person would not feel free to leave an encounter with police." *Bennett v. City of Eastpointe*, 410 F.3d 810, 834 (6th Cir. 2005). In *Florida v. Bostick*, 501 U.S. 429, 439 (1991), the Supreme Court stated that "a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter."

Whether a breathalyzer test administered to an off-duty police officer amounts to an unconstitutional seizure is an issue of first impression for this court. "[P]olicemen, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights." *Garrity v. New Jersey*, 385 U.S. 493, 500 (1967). The Fourth Amendment's prohibition against "unreasonable searches and seizures" therefore applies to police officers. Moreover, drug or alcohol testing of a governmental employee implicates the Fourth Amendment even though the testing may not be

related to enforcement of the criminal law. *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 616 (1989) (applying drug and alcohol testing to railroad employees for safety reasons).

The defendants cited, and the district court relied on, the cases of *Grow v. City of Milwaukee*, 84 F. Supp. 2d 990 (E.D. Wis. 2000)*,* and *Driebel v. City of Milwaukee*, 298 F.3d 622 (7th Cir. 2002). Pennington has not addressed either of these two cases. *Grow* involved a number of Milwaukee police officers who were required to submit to breathalyzer tests while off duty. The facts surrounding one of the officers, Jean Docter, are strikingly similar to the instant action.

Docter was attending a Serbian Day Festival in Milwaukee when a fight broke out. She attempted to intervene in the fight and was injured. Several on-duty officers responded to her 911 call, and Docter approached one of the officers to lodge a battery complaint against the individual who had struck her. The on-duty officers on the scene suspected that Docter was intoxicated. Her supervisors ordered Docter to return to the police station and take a breathalyzer test. When the test determined that Docter's breath alcohol level was 0.17, she was suspended for five days without pay.

The district court held that Docter was seized when she was ordered to submit to the breathalyzer test. *Grow*, 84 F. Supp. 2d at 1004. But the seizure was held to be reasonable because Docter was in a "public place[] and might have had to perform police duties." *Id.* The district court determined that Docter was "seized under circumstances where, if intoxicated, [she] would have presented a danger to the public." *Id.*

Two years later, the Seventh Circuit in *Driebel* called into question the "seizure" conclusion of *Grow*. 298 F.3d at 641. *Driebel* involved claims brought by Milwaukee police officers that they had been unconstitutionally ordered to remain on duty and return to headquarters for questioning related to a criminal investigation into their activities. *Id.* The Seventh Circuit reasoned as follows:

> Grow fails to acknowledge that police officers: (1) may reasonably believe, based upon their workplace obligations to comply with department's guidelines and regulations, that their *employment relationship* will be severed if they refuse or disobey an order, direction, or request to accompany detectives to the department's headquarters; but (2) lack any reasonable basis to feel that they will be *restricted by force or a show of lawful authority in their freedom of movement or their ability to terminate the encounter*.

*Id.* at 642 (emphasis in original).

According to the Seventh Circuit, "the possibility or even probability of a future adverse employment action—as opposed to physical detention—cannot enter our analysis of whether the officers in this case were seized." *Id.* (emphasis omitted). This conclusion is based on the need to "distinguish between a police department's actions in its capacity as an employer and its actions as the law enforcement arm of the state." *Id.* at 637. The court concluded that because

> the Fourth Amendment does not protect against the threat of job loss, the relevant constitutional inquiry must focus on whether reasonable people in the position of the subordinate officers would have feared *seizure or detention* if they had refused to obey the commands given by their superior officers.

*Id.* at 642 (emphasis in original).

Pennington acknowledges in his brief that he "was compelled by the threat of job loss to submit to being taken to Central Station, and given a breathalyzer test." The Supreme Court, however, has held that a "person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained." *United States v. Mendenhall*, 446 U.S. 544, 553 (1980). A person is not seized simply because he believes that he will lose his job. *Dreibel*, 298 F.3d at 642.

Hagar disputes Pennington's assertion that he was not free to leave. Specifically, Hagar testified that "if [Pennington] hadn't agreed to take the test, he would have gone home," subject to departmental disciplinary action. During his deposition, Pennington essentially agreed with Hagar's characterization when he testified that "if they would have let me leave willingly, I probably would have gotten fired. If they would have exerted authority, I would have probably been put in handcuffs and placed in the back seat of a car." In other words, Pennington was afraid that he would lose his job or suffer disciplinary action if he failed to submit to the breathalyzer test, and he agreed to the test for that reason. Pennington was not handcuffed, he was not placed in the back seat of the police car, he was not read his *Miranda* rights, and he was allowed to return home without filing his report of the incident.

We find the reasoning of the Seventh Circuit in *Driebel* to be both persuasive and applicable to Pennington's claim. A reasonable off-duty officer in Pennington's position would not have feared seizure or detention if he had refused to take the breathalyzer test. *See Driebel*, 298 F.3d at 642. Pennington himself did not appear to fear seizure or detention; instead, he was afraid that he would be terminated or suspended. Under the totality-of-the-circumstances analysis, we conclude that Pennington was not seized when he submitted to the breathalyzer test. Moreover, because Pennington submitted to the breathalyzer test, we have no need to decide whether he could have been permissibly discharged if he had failed to comply. We also have no need to determine whether Bishop and Hagar are entitled to qualified immunity. *See McKinley v. City of Mansfield*, 404 F.3d 418, 429 (6th Cir. 2005) (stating that "as a precursor to the *Harlow* qualified immunity analysis, a court must first determine whether *any* constitutional violation occurred, let alone the violation of a clearly established right") (emphasis in original).

## III. CONCLUSION

For all of the reasons stated above, we **AFFIRM** the judgment of the district court.