**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 12-2208

_____

MICHAEL GWYNN;
BRENDON RYAN,

Appellants

v.

CITY OF PHILADELPHIA; CHARLES RAMSEY;
PATRICK KELLY; MELVIN SINGLETON;
SALVATORE FEDE; FRANK PALOMBO

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 11-cv-01128)
District Judge: Honorable Robert E. Kelly

_____

Argued April 16, 2013
Before: AMBRO, HARDIMAN and COWEN, *Circuit
Judges*.

(Filed: June 19, 2013)

Brian M. Puricelli [ARGUED]
Law Offices of Brian Puricelli
691 Washington Crossing Road
Newtown, PA 18940-0000
        *Attorneys for Plaintiff-Appellants*

Kelly S. Diffily
Jane L. Istvan [ARGUED]
Shant H. Zakarian
City of Philadelphia
Law Department
17th Floor
1515 Arch Street
One Parkway
Philadelphia, PA 19102
        *Attorneys for Defendant-Appellees*

_____

OPINION OF THE COURT
_____


HARDIMAN, *Circuit Judge*.

City of Philadelphia Police Officers Michael Gwynn and Brendon Ryan appeal a summary judgment entered in favor of several of their fellow officers and the City. Appellants asserted constitutional claims under 42 U.S.C. § 1983, statutory claims under the Fair Labor Standards Act, and various state law claims. For the reasons that follow, we will affirm the judgment of the District Court.

2

## I

As this appeal comes to us following summary judgment, we review the facts in the light most favorable to Appellants. *See Montone v. City of Jersey City*, 709 F.3d 181, 189 (3d Cir. 2013).

## A

On December 15, 2009, while on duty, Appellants stopped and frisked men they believed were engaged in an illegal drug transaction. One of the men they frisked, Keyshawn Artis, accused Appellants of stealing money from him. Appellants denied the accusation, and told Artis to "move along."

When Appellants returned to headquarters, a superior officer, Sergeant Salvatore Fede, ordered them into his office. After informing Appellants that a complaint about their behavior had been made to the Internal Affairs Bureau, Sergeant Fede took Appellants to Captain Melvin Singleton's office. Appellants did not feel free to leave because they had been "ordered to be in the captain's office." App. 285. After waiting fifteen to twenty minutes, Appellants and Sergeant Fede were joined by Captain Singleton, then-Sergeant Patrick Kelly, and Lieutenant Frank Palumbo.

Appellants were instructed to stay in Captain Singleton's office until officers from the Internal Affairs Bureau arrived. While Appellants waited, Captain Singleton offered them water and told them that they could watch television, but instructed them not to use their cell phones. Appellants then were questioned about their interaction with Artis, including whether they had taken money from him. In

3

that regard, Appellants were asked to remove their jackets and Gwynn was asked to remove his outer vest. Appellants also were told to pull out their pockets, pull up their pant legs and pull down their socks, and open their wallets. Finally, Appellants were told that cooperation would be in their "best interest" insofar as it could demonstrate to Internal Affairs that they did not have Artis's money when they returned from their patrol. During the hour or so they spent in Captain Singleton's office while awaiting the arrival of Internal Affairs officers, Appellants did as they were told because the orders came from their "superiors and supervisors," and they feared "discipline and possible loss of employment" if they disobeyed. App. 241.

Upon their arrival at Captain Singleton's office, two Internal Affairs officers questioned Appellants for about fifteen to twenty minutes and then left briefly to talk to Artis, the complainant. Appellants were told to stay put until the Internal Affairs officers returned after speaking with Artis. As Appellants waited, Gwynn asked for permission to call his wife to arrange for her to pick up their son, and then-Sergeant Kelly granted permission. The Internal Affairs officers returned, stated that they believed Artis, and told Appellants that they were not needed for anything further that day. Appellants left Captain Singleton's office around 8:15 p.m. and when they opened their lockers that evening, it appeared as though they had been searched.

B

In February 2011, Appellants sued Captain Singleton, Lieutenant Kelly, Sergeant Fede, and Lieutenant Palumbo along with the City and its Police Commissioner, Charles Ramsey. Since Appellants' claims arose under federal and

4

state law, the District Court exercised jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

Appellants served requests for admission in June 2011 that went unanswered until the beginning of August 2011, after the 30-day deadline prescribed by the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 36(a)(3). Because Appellants' requests for admission were deemed admitted by operation of Rule 36, Appellees filed a motion in the District Court on September 9, 2011, to withdraw those admissions. The District Court granted that motion, gave Appellees ten additional days to respond, and extended the discovery period for 60 days.

The parties filed cross motions for summary judgment and the District Court granted the motion of Appellees. Gwynn and Ryan filed this timely appeal, which we have jurisdiction to hear pursuant to 28 U.S.C. § 1291.

II

Gwynn and Ryan first argue that the District Court abused its discretion when it allowed Appellees to withdraw their admissions. Had those admissions remained undisturbed, Appellants argue, their summary judgment motion would have been granted. Because the District Court did not err when it allowed Appellees to withdraw their admissions, we reject Appellants' first argument.

Rule 36(a)(3) of the Federal Rules of Civil Procedure provides that a request for admission is deemed admitted if a party does not respond within 30 days. Nevertheless, courts may permit withdrawal of the admission if: (1) doing so "would promote the presentation of the merits of the action";

5

and (2) "the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits." Fed. R. Civ. P. 36(b). Courts may consider other factors as well, such as whether the moving party can show good cause for the delay, *see Conlon v. United States*, 474 F.3d 616, 625 (9th Cir. 2007), but they are not required to do so, *see* Fed. R. Civ. P. 36(b).

Here, the District Court's discretionary decision to permit Appellees to withdraw the admissions was consistent with both requirements of Rule 36(b). Upholding the admissions would have significantly interfered with Appellees' ability to present the merits of their case, and Appellants have failed to identify any prejudice they suffered as a result of the withdrawal. In their brief, Appellants state that counsel "detrimentally relied" upon the admissions as indicated at pages 6–8 of their opposition to the motion in the District Court. There, Appellants argued that counsel had not moved to compel discovery of certain documents in reliance on the admissions—a concern that was adequately addressed by the extension of the discovery deadline. Appellants further argued that counsel had "developed a litigation strategy that placed reliance on the conclusive facts deemed from the Admissions." Dkt. No. 9 at 8. "The prejudice contemplated by Rule 36(b)," however "is not simply that the party who obtained the admission now has to convince the jury of its truth. Something more is required." *Bergemann v. United States*, 820 F.2d 1117, 1121 (10th Cir. 1987).

In sum, because the District Court did not abuse its discretion when it withdrew Appellees' deemed admissions, it did not err when it denied Appellants' motion for summary judgment, which was premised upon the efficacy of those admissions.

III

Appellants next argue that the District Court erred when it entered summary judgment against them on their constitutional claims arising under 42 U.S.C. § 1983, as well as their claims for false imprisonment and violations of the Pennsylvania Minimum Wage Act, 43 Pa. Cons. Stat. Ann. § 333.101 *et seq.*, and the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*[1]  We exercise plenary review over summary judgments, *Howley v. Mellon Fin. Corp.*, 625 F.3d 788, 792 (3d Cir. 2010), and will affirm if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a).

A

Appellants' constitutional arguments are founded upon the Fourth Amendment's prohibition against unreasonable searches and seizures, as applied to the States through the Fourteenth Amendment.  Specifically, Gwynn and Ryan claim they were unreasonably seized when they were ordered to wait in Captain Singleton's office until the Internal Affairs officers arrived, and that they were unreasonably searched when their superiors asked them to turn out their pockets, take off outer layers of clothing, and reveal the contents of their socks and wallets.  Although it is not entirely clear from their brief, Appellants seem also to contend that Appellees conducted an unreasonable search of their lockers.  Viewing

---

[1] Appellants also asserted a First Amendment claim for retaliation in their complaint, but they do not now challenge its dismissal.

the record in the light most favorable to Appellants, the District Court did not err when it granted summary judgment because Appellants failed to establish either that they were seized or that they were subjected to an unreasonable search.

1

A person is seized under the Fourth Amendment only when "his freedom of movement is restrained" either "by means of physical force or a show of authority." *United States v. Mendenhall*, 446 U.S. 544, 553 (1980) (explaining that "[o]nly when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards"). Police officers, no less than civilians, are protected by the Fourth Amendment, and, in some circumstances, they may be seized as the result of an order given by another officer. *See Driebel v. City of Milwaukee*, 298 F.3d 622, 637 (7th Cir. 2002) (recognizing "the well-settled rule that men and women do not surrender their freedoms when joining the police force"); *see also Cerrone v. Brown*, 246 F.3d 194, 196 (2d Cir. 2001) (explaining that when police officers are seized in the context of a criminal investigation, probable cause is required).

This does not mean, however, that every order a police officer feels compelled to obey amounts to a seizure. Public employees, like their counterparts in the private sector, often must comply with orders issued by supervisors, and may suffer work-related consequences if they disobey. *See INS v. Delgado*, 466 U.S. 210, 218 (1984) ("Ordinarily, when people are at work their freedom to move about has been meaningfully restricted . . . by the workers' voluntary obligations to their employers."). This is especially true for police officers, who are part of a "paramilitary organization

8

that must maintain the highest degree of discipline, confidentiality, efficiency, and espirit [sic] de corps among its officers, who are the first line of defense against lawlessness." *Driebel*, 298 F.3d at 638–39. Officers are trained to obey orders from their superiors and may be subject to discipline if they fail to do so. *Id.* at 639. Characterizing work-related demands as seizures whenever an officer feels compelled to obey them would not further any interest protected by the Fourth Amendment, and it would significantly interfere with the effective management of police forces. *See Mendenhall*, 446 U.S. at 553–54 (explaining that the purpose of the Fourth Amendment is "to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals" (quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 554 (1976))); *O'Connor v. Ortega*, 480 U.S. 709, 722 (1987) (acknowledging "the common-sense realization that government offices could not function if every employment decision became a constitutional matter" (quoting *Connick v. Myers*, 461 U.S. 138, 143 (1983))).

To determine whether a police officer has been seized for purposes of the Fourth Amendment, our sister courts of appeals have recognized that the distinction between situations in which the police department issues orders "in its capacity as an employer" and those in which it acts "as the law enforcement arm of the state." *Pennington v. Metro. Gov't of Nashville & Davidson Cnty.*, 511 F.3d 647, 652 (6th Cir. 2008) (quoting *Driebel*, 298 F.3d at 637); *see also Aguilera v. Baca*, 510 F.3d 1161, 1169 (9th Cir. 2007). An officer is not seized "simply because he believes that he [would] lose his job" or suffer other work-related consequences if he were to leave the police station or fail to

report to a designated area. *Pennington*, 511 F.3d at 652. Rather, an officer is seized if a reasonable person in his position would believe that he were not actually free to disobey the command—that is, if he feared he would be detained if he attempted to leave. *Id.* We agree with the Courts of Appeals for the Sixth, Seventh, and Ninth Circuits that the distinction between police conduct *qua* employer and police conduct *qua* law enforcement agent is a valid one.

For example, in *Driebel v. City of Milwaukee*, an officer who was subject to an internal investigation was ordered to "stand by" at the police station until he received further instructions. 298 F.3d at 629. While waiting at the garage, he was neither told that he was the subject of a criminal investigation nor was he read his *Miranda* rights. *Id.* at 643. He received overtime pay for the assignment and retained possession of his police-issued equipment while waiting. *Id.* The Seventh Circuit held that this was not a seizure, explaining that the officer "must have been aware that no officer was permitted to use force or any show of authority to prevent him from departing the garage if he so chose." *Id.*

*Driebel* also addressed the claims of another officer under investigation, who was ordered to report to Internal Affairs headquarters for questioning. While there, he was advised that he was under criminal investigation and read his *Miranda* rights, and he was not permitted to use the restroom unaccompanied. *Id.* at 648. Police policy required, however, that officers be told their rights any time they were questioned, even as part of an internal investigation. *Id.* The Internal Affairs officers also had a legitimate reason for supervising his trips to the restroom, namely, to ensure that he was not communicating with others about the investigation.

10

*Id.* In addition, the officer was not told that he was suspected of any particular crime; he was not addressed in a threatening manner; he retained his police-issued equipment; and he was compensated for his time at the headquarters. *Id.* Although noting that this second incident was a more borderline case, the Seventh Circuit also determined that this was not a seizure. *Id.* at 648–49.

The Sixth Circuit applied the same analysis in *Pennington v. Metropolitan Government of Nashville and Davidson County*. There, while in a bar, off-duty police officer Pennington was involved in an altercation in which he identified himself as a police officer. 511 F.3d at 648. Officers in his department were required to comply with department policy whenever they invoked their authority as police officers, and that policy forbade intoxication. *Id.* at 649. Another officer who arrived at the scene asked Pennington to return to the station for a breathalyzer test as part of an internal investigation. Pennington was neither handcuffed and placed in the back seat of the police car nor read his *Miranda* rights, and he was allowed to return home before completing a report. *Id.* He did not believe that he would be forcibly detained if he attempted to leave; rather he claimed he was "compelled by the threat of job loss" to comply. *Id.* at 652. The Sixth Circuit explained that "[a] reasonable off-duty officer in Pennington's position would not have feared seizure or detention if he had refused to take the breathalyzer test." *Id.* Accordingly, Pennington had not been seized. *Id.*

Likewise, in *Aguilera v. Baca*, the Ninth Circuit held that officers who were ordered to stay after work to speak to Internal Affairs officers had not been seized. 510 F.3d at 1169. The court emphasized that the department's treatment

11

of the officers differed from its treatment of detained criminal suspects. *Id.* at 1170. For example, the officers waited in unlocked rooms with intermittent supervision and no request to leave was denied. The officers also remained in possession of their police-issued equipment. In addition, they were asked if they wanted food or drink; they were free to use the restroom unattended and free to leave after the interview; and they were paid overtime. *Id.* The Ninth Circuit explained that to characterize their treatment as a seizure "would equate to a pronouncement that a law enforcement agency cannot, even under . . . the agency's general policies to preserve public confidence and the integrity of its personnel in the discharge of their public safety responsibilities, order its employees to cooperate in an investigation of possible officer misconduct by standing by at their duty station after the end of their watch." *Id.* at 1171; *see also Fournier v. Reardon*, 160 F.3d 754, 757 (1st Cir. 1998) (plaintiff was not "seized" when he submitted to being handcuffed as part of a basic training academy course, even though objecting to such treatment may have had negative consequences for his continued employment).

The facts in *Driebel*, *Pennington*, and *Aguilera* stand in contrast to those presented to the Court of Appeals for the Second Circuit in *Cerrone v. Brown*. There, the officer was stopped by the investigative team, who "asked whether he was carrying a weapon, allegedly placed him in the felony position, placed him in the back of an unmarked police car (where he was guarded), transported him to a hotel room, read him his *Miranda* rights, and informed him that he was the target of a criminal investigation." *Cerrone*, 246 F.3d at 198 (internal quotation marks and alteration omitted). The police officers conceded that their actions amounted to a

12

seizure, so the court did not reach the issue. Nevertheless, these are the kinds of circumstances that would make an officer feel he was not free to leave—not by virtue of being an employee of the police department, but as a citizen who was being detained. *See Driebel*, 298 F.3d at 649 (explaining that a jury could find that a seizure occurred when an officer grabbed another officer, turned him around, and directed him toward the squad car).

We recognize that whether a police officer would reasonably have perceived his superior officer to be issuing orders as his supervisor or as a law enforcement agent during the course of an investigation will not always be clear. Here, however, the evidence demonstrated that, to the extent Appellants felt compelled to obey their superior officers' commands, that compulsion was borne out of their employment relationship. There was no suggestion that Appellants were under criminal investigation; they were asked to wait in Captain Singleton's office so they could speak with Internal Affairs agents. Additionally, the circumstances surrounding the investigation were not particularly coercive. Although Appellants were not able to use the phone while waiting for Captain Singleton to return, they were offered drinks, they were asked if they wanted to watch television, and they retained all of their police-issued equipment. Moreover, Appellants admitted in their affidavits and deposition testimony that they followed the orders of their superior officers because they were concerned that they would suffer work-related consequences if they did not do so. For these reasons, we hold there was no Fourth Amendment seizure of Gwynn and Ryan.

Appellants also argue that their superior officers conducted an unreasonable search when they asked Appellants to reveal whether they had money in their pockets, vests, or socks and when they went through Appellants' lockers without probable cause or a warrant. Although the Fourth Amendment protects government employees against unreasonable searches by their employers, *O'Connor*, 480 U.S. at 715, work-related searches of a government employee's person or property often fall into the "special government needs" exception to the Fourth Amendment's warrant and probable cause requirements. We find that to be the case here as well.[2]

When an "intrusion serves special government needs, beyond the normal need for law enforcement," the government must show that its search was reasonable. *Wilcher v. City of Wilmington*, 139 F.3d 366, 373–74 (3d Cir. 1998) (quoting *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 665–66 (1989)). In *O'Connor v. Ortega*, the Supreme Court held in a plurality opinion that a non-criminal investigative search will be reasonable if, at its inception, "there are reasonable grounds for suspecting that the search will turn up evidence that the employee is guilty of work-

---

[2] Contrary to Appellants' suggestion in their Rule 28j letter, the Supreme Court's decision in *Missouri v. McNeely*, 133 S. Ct. 1552 (2013), has no bearing on this analysis. At issue in *McNeely* was whether the natural metabolization of alcohol in the bloodstream is necessarily an exigent circumstance justifying a warrantless search. *Id*. at 1556. That decision does not address the special needs doctrine.

related misconduct," 480 U.S. at 726, and "the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the nature of the misconduct," *id.* (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 342 (1985)) (alterations omitted); *see also City of Ontario, Cal. v. Quon*, 130 S. Ct. 2619, 2630 (2010).[3] The Supreme Court explained that this lower standard is appropriate for work-related investigations because "[p]ublic employers have an interest in ensuring that their agencies operate in an effective and efficient manner, and the work of these agencies inevitably suffers from the inefficiency, incompetence, mismanagement, or other work-related misfeasance of its employees." *O'Connor*, 480 U.S. at 724. It emphasized that, "in many cases, public employees are entrusted with tremendous responsibility, and the consequences of their misconduct or incompetence to both the agency and the public interest can be severe." *Id*.

The need for oversight and corrective action is particularly acute in police departments. This is because officers "exercis[e] the most awesome and dangerous power that a democratic state possesses with respect to its residents—the power to use lawful force to arrest and detain

---

[3] Justice Scalia, concurring in *O'Connor*, stated that he would hold that "government searches to retrieve work-related materials or to investigate violations of workplace rules—searches of the sort that are regarded as reasonable and normal in the private-employer context—do not violate the Fourth Amendment." 480 U.S. at 732; *see also Quon*, 130 S. Ct. at 2628. The search here was an investigation of violations of workplace rules, and, as such, would meet this alternative standard as well.

them." *Policemen's Benevolent Ass'n of N.J., Local 318 v. Washington Twp.*, 850 F.2d 133, 141 (3d Cir. 1988) (emphasizing the need for "public confidence, respect and approbation" with respect to police officers); *see also Aguilera*, 510 F.3d at 1168 (explaining that society has an "important interest in ensuring the highest integrity by those entrusted with discharging the duties of a peace officer"); *Shields v. Burge*, 874 F.2d 1201, 1204 (7th Cir. 1989) ("The public and government have strong interests in ferreting out misconduct by police officers.").

As noted herein, the investigation into Appellants' conduct was work related; it was not a criminal investigation. Their superior officers had reasonable grounds to investigate misconduct in view of the formal complaint Artis made to Internal Affairs. Indeed, Ryan acknowledged that he understood why his superiors would need to investigate Artis's claim. Further, the search was not excessively intrusive given the nature of the alleged misconduct. Appellants' superior officers examined their outer clothing, wallets, pockets, socks, and the cuffs of their pants to see if they had a large amount of money on them, and checked their lockers for the same purpose. The search was reasonably related to its purpose—that is, ensuring that Appellants did not possess Artis's money—and it was not overly intrusive. *Cf. Copeland v. Phila. Police Dep't*, 840 F.2d 1139, 1143–44 (3d Cir. 1988) (compulsory urinalysis, based on reasonable suspicion that officer had engaged in drug use, was not a violation of the Fourth Amendment). Because the search was not unreasonable, it did not violate the Fourth Amendment.[4]

---

[4] Appellants further challenge the dismissal of two other related claims. First, they argue that the District Court

B

Appellants also claim they were not credited for working overtime on the day of the Internal Affairs interview, in violation of the Pennsylvania Minimum Wage Act and the Fair Labor Standards Act. Appellees presented evidence, in the form of an affidavit from Lieutenant Palumbo and the police department's daily attendance report, that Appellants were, in fact, paid. Appellants failed to produce any evidence to rebut that evidence.

On appeal, Appellants challenge the adequacy of Appellees' evidence of payment. They claim that the affidavit from Lieutenant Palumbo was not based on personal

---

erred in dismissing their false imprisonment claim. To establish false imprisonment under Pennsylvania law, Appellants were required to show that: (1) they had been detained; and (2) the detention was unlawful. *Renk v. City of Pittsburgh*, 641 A.2d 289, 293 (Pa. 1994). Appellants contend that they were unlawfully detained when they were unreasonably seized in violation of the Fourth Amendment. As discussed above, there was no seizure, and thus, there was no unlawful detention. *See James v. City of Wilkes-Barre*, 700 F.3d 675, 682–83 (3d Cir. 2012). Second, Appellants contend the District Court erred in dismissing their claim under "the Due Process Clause and the 14th Amendment, which protects liberty interests." Gwynn Br. at 23. Appellants merely allude to this claim in their briefing, where they incorrectly contend that "the district court failed to even mention the claim." Gwynn Br. at 23–24; *but see Gwynn v. City of Phila.*, 866 F. Supp. 2d 473, 488 n.10 (E.D. Pa. 2012). Appellants have failed to raise any substantive challenge to the dismissal of this claim.

17

knowledge and the daily attendance report was not properly authenticated. This argument disregards the applicable burden of proof, however. Appellants, as the plaintiffs, were required to present some evidence showing that they were not credited for working overtime. *See Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686–87 (1946), *superseded by statute on other grounds as stated in IBP, Inc. v. Alvarez*, 546 U.S. 21, 41 (2005). They identified no such evidence in their response to the motion for summary judgment—not even in the form of affidavits, stating under oath that they had not been paid. Indeed, Gwynn stated in his deposition that he did not know whether he had been paid overtime for December 15, 2009. Thus, the District Court did not err when it granted summary judgment on this claim.

\* \* \*

Police officers serve a critical function in any civilized society. The power they wield and the responsibilities they assume require them to act beyond reproach. When a citizen lodges a credible complaint of police misconduct, it is imperative that it is investigated, both to protect the citizen who may be wronged and the officers who may be falsely accused. When police administrators undertake employment-related detentions such as the one experienced by Officers Gwynn and Ryan, there is no Fourth Amendment seizure. And because the searches of Gwynn and Ryan were reasonable, we will affirm the summary judgment of the District Court.