In the

# United States Court of Appeals
## For the Seventh Circuit

No. 13-2187

MONTELL CARTER, MICHAEL LOPEZ, and MILWAUKEE POLICE
ASSOCIATION,

*Plaintiffs-Appellants*,

*v.*

CITY OF MILWAUKEE and KEITH ECCHER,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 10 CV 00782 — **Patricia J. Gorence**, *Magistrate Judge*.

ARGUED NOVEMBER 8, 2013 — DECIDED FEBRUARY 19, 2014

Before POSNER, ROVNER, and WILLIAMS, *Circuit Judges*.

WILLIAMS, *Circuit Judge*. While police officers were executing a search warrant in a Milwaukee apartment, the apartment's resident accused the police of taking around $1750 of his cash. The commanding officer then ordered all officers to remain on the scene while they awaited further direction. This order did not come at a good time for Officer Montell Carter, who had taken a colon cleansing product

outside the apartment and now needed to use the restroom, badly. Not wanting to use the apartment's bathroom, Carter told then-Lieutenant Keith Eccher he needed to leave to use the restroom. The lieutenant put his hand up and responded that he needed to search Carter first. The lieutenant then patted Carter down and searched his jacket, boots, and the items he was carrying. The dramatic ending to these events is, in fact, not dramatic at all. The lieutenant did not find the allegedly missing cash or any contraband on Carter, and Carter returned to the police station and used the restroom there. Carter filed this lawsuit maintaining he was the subject of an unconstitutional seizure and search. Because no reasonable officer in Carter's position would have feared arrest or detention if he did not comply with the search request, we conclude he was not seized. As a result, we affirm the district court's grant of summary judgment in the defendants' favor.

## I. BACKGROUND

When he was called to the scene of a search warrant execution the afternoon of February 26, 2009, Montell Carter had been a police officer with the Milwaukee Police Department for nearly thirteen years. On that day, Officer Carter and other officers were stationed outside a residence while Tactical Enforcement Unit team members went inside to ensure there was no threat to the officers who would perform the search. Carter was outside for about twenty to thirty minutes before the tactical unit announced that all was clear.

Officer Carter had been taking Colonix, a non-prescription supplement to clean his colon, for about two weeks in an effort to lose weight. He did not, however, take the supplement at his normal time before leaving home for

his shift that day because he had been running late. Thinking he would not be needed in the residence right away, Carter returned to his squad car after the tactical unit gave the all clear, mixed the Colonix with water, and drank it. He did so knowing that taking Colonix made him need to more frequently use the restroom.

Officer Carter and other officers entered the residence dressed in police uniform to search for drugs and currency. Tactical enforcement officers were still leaving the residence while the officers entered. Carter and his partner, Officer Michael Lopez, helped search the northwest bedroom. At some point, the apartment's resident, Mr. Mitchell (his first name is not clear from the record), told Officer Jose Viera that $1750 or $1800 in cash was missing from his bedroom. Mitchell said he had been sitting in his bedroom counting his money when the "guys with helmets" entered. Mitchell said he then threw the money on the floor next to him.

Following Mitchell's allegation, Officer Viera contacted a supervisor by telephone, who told Viera to "freeze everything" until representatives from the Police Department's Professional Performance Division ("PPD") or other supervisors arrived. As a result, the officers on the scene were informed they were not free to leave.

About thirty to forty-five minutes later, a sergeant arrived. Lieutenant Keith Eccher, who had run the command post at the scene but left after the tactical squad secured the residence, also returned to the apartment. Eccher was the highest ranking officer at the site. A sergeant informed Eccher of the resident's allegation and told him there was an opportunity for all the tactical squad or search team mem-

bers to have taken the money. Eccher contacted the PPD, and he informed the officers on site that PPD was on its way.

Feeling the effects of the supplement he had taken and sweating profusely, Officer Carter approached Lieutenant Eccher in the kitchen of the residence and told him he needed to leave as he needed to use the bathroom very badly. Carter maintains he did not want to use the bathroom in the residence because of its very dirty condition. He also asserts that even in a clean house, he would not feel comfortable using someone else's restroom. (The parties do not point to any Department policy on point.)

Lieutenant Eccher put his hand up, with his palm straight out, and said in a firm voice to Officer Carter, "You can't leave until I search you." Eccher did not come into any contact with Carter when he put his hand up. Eccher directed Carter to take off his police coat, outer vest carrier, and duty belt, which held his firearm. Eccher patted down Carter; in doing so, he did not pat down Carter's genital area but did pat down his back pockets. Eccher searched Carter's jacket, including its pockets, looked in Carter's wallet and police memo book, and searched his duty belt. Eccher also had Carter remove his boots and searched those.

Lieutenant Eccher did not take Officer Carter's badge or police identification. Nothing out of the ordinary was found on Carter, and his duty belt and firearm were returned to him. Officer Lopez told Eccher he wished to leave also, and Eccher responded, "Well, I gotta search you, too." Lopez told Eccher that he was not going to take his boots off, and Eccher did not make him do so. Eccher then patted down Lopez, finding nothing. The searches took place inside the kitchen, where Eccher, a sergeant, Carter, and Lopez were

present at the time. Apartment residents could see the search as well, with Eccher explaining the search took place in plain view in front of the residents to remove any suspicion.

With no protocol specific to searching officers in an officer-involved allegation, Lieutenant Eccher explained that he searched Officers Carter and Lopez after they asked to leave the scene because they had "means and access to the missing money," stated they needed to leave to go to the bathroom as soon as they learned that PPD Criminal was coming, and to remove them from suspicion. After they were searched, Carter and Lopez left the residence together and returned to the district police station, where Carter used the restroom. Later, after PPD Criminal arrived, another officer, Officer Rachel Goldbeck, was allowed to leave the scene to use the restroom without being searched.

Officers Carter and Lopez filed a lawsuit pursuant to 42 U.S.C. § 1983 alleging that Eccher and the City of Milwaukee violated the Fourth Amendment by illegally seizing and searching them. The district court granted the defendants' motion for summary judgment.

## II. ANALYSIS

Officer Carter contends he was the subject of an unconstitutional seizure and search. He maintains that he was seized when Lieutenant Eccher held his hand out and told him that he had to be searched if he wished to leave the premises. We review the district court's grant of summary judgment de novo, viewing evidence in the record in the light most favorable to the non-moving party, plaintiff Officer Carter, and giving him the benefit of all reasonable inferences. *See Swetlik v. Crawford*, 738 F.3d 818, 821 (7th Cir. 2013).

The Constitution forbids not all searches and seizures, but only "unreasonable searches and seizures." U.S. Const. amend. IV; *Terry v. Ohio*, 392 U.S. 1, 9 (1968). A "seizure" within the meaning of the Fourth Amendment occurs when a person's "freedom of movement is restrained" either "by means of physical force or show of authority." *United States v. Mendenhall*, 446 U.S. 544, 552 (1980). "If a reasonable person would feel free to terminate the encounter, then he or she has not been seized." *United States v. Drayton*, 536 U.S. 194, 201 (2002). In considering whether there was a seizure, we "consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 439 (1991).

It is true that the Fourth Amendment protects police officers, not just ordinary citizens. *Garrity v. New Jersey*, 385 U.S. 493, 500 (1967). "This does not mean, however, that every order a police officer feels compelled to obey amounts to a seizure." *Gwynn v. City of Phila.*, 719 F.3d 295, 300 (3d Cir. 2013). Nothing in the Fourth Amendment gives public employees, including police officers, greater workplace rights than private sector employees. *Driebel v. City of Milwaukee*, 298 F.3d 622, 637 (7th Cir. 2002). As in the private sector, public employees must often comply with their supervisors' orders and can suffer consequences at work for failure to comply. *Id.* at 639. The requirement of complying with supervisors' directives has particular meaning for police officers, who are part of a "paramilitary organization that must maintain the highest degree of discipline, confidentiality, efficiency, and [esprit] de corps among its officers, who are the first

line of defense against lawlessness," and who agree to obey lawful orders from higher-ranking officers. *Id.* at 638-39.

In this spirit, we have distinguished "between a police department's actions in its capacity as an employer and its actions as the law enforcement arm of the state." *Id.* at 642. The Fourth Amendment does not protect against the threat of job loss. *See id.*; *see also Fournier v. Reardon*, 160 F.3d 754, 757 (1st Cir. 1998) (finding officer not seized when handcuffed during training exercise even though there could have been negative employment consequences had he refused). So while an officer in Carter's position may have feared job-related consequences if he were to leave the residence without being patted down and searched, the potential for work-related discipline is not sufficient to succeed on a Fourth Amendment claim.

Rather, "the relevant constitutional inquiry must focus on whether reasonable people in the position of the subordinate officers would have feared *seizure or detention* if they had refused to obey the commands given by their superior officers." *Driebel*, 298 F.3d at 642 (emphasis in original). In this regard, it is not enough that Carter's employer restricted his movement; indeed, he does not maintain that the "freeze the scene" order meant he or other officers were seized. *See I.N.S. v. Delgado*, 466 U.S. 210 (1984). Illustrative of this principle is the Supreme Court's decision in *Delgado*, where it considered the Immigration and Naturalization Service's practice of entering factories and questioning employees about their citizenship while INS agents were stationed near door exits. The Court recognized that the employees may not have been free to leave, but it said that was not enough to violate the Fourth Amendment: "[o]rdinarily, when peo-

ple are at work their freedom to move about has been mean-
ingfully restricted, not by the actions of law enforcement of-
ficials, but by the workers' voluntary obligations to their
employers." *Id.* at 218. The Court concluded the employees
were not seized because even though they were not free to
leave the building without being questioned, the agents'
conduct "should have given [the employees] no reason to
believe that they would be detained if they gave truthful an-
swers put to them or if they simply refused to answer." *Id*.
The defendants contend that Officer Carter similarly had no
reason to believe he would be detained had he stated he did
not want to be searched.

This is not the first time we have considered an officer's
claim that he was seized while on the job; we considered
several claims of unlawful seizure by officers in our *Driebel*
decision. For example, when an officer was ordered to work
overtime and "stand by" for three and a half hours in a po-
lice garage without being placed under formal arrest and
while he retained possession of his police-issued equipment,
we found he was not seized. 298 F.3d at 642-43. We ex-
plained that the officer "must have been aware that no of-
ficer was permitted to use force or any show of authority to
prevent him from departing the garage if he so chose." *Id.* at
643; *see also Pennington v. Metro. Gov't of Nashville and Da-
vidson Cnty.*, 511 F.3d 647, 652 (6th Cir. 2008) (concluding that
an off-duty officer who submitted to a breathalyzer test at
his superiors' order was not seized when he was not hand-
cuffed, not placed in the back seat of a police car, not read
his rights, and was allowed to return home without filing a
report). But when the officer was advised of his rights, taken
into custody, and removed of his police equipment, we ruled
that he had been seized. *Id.*; *cf. Cerrone v. Brown*, 246 F.3d 194,

198 (2d Cir. 2001) (noting concession by defendants that officer seized when stopped by investigative team, placed in back of unmarked police car, read *Miranda* rights, and informed he was the target of a criminal investigation).

The Third Circuit's decision in *Gwynn* contains circumstances similar to this case. There, a man whom two police officers had frisked accused them of stealing money from him. *Gwynn*, 719 F.3d at 297. When the officers returned to headquarters, their superior officer ordered them into an office, where they were told a complaint had been made about them to the Internal Affairs Bureau. They were then ordered to report to the captain's office and to stay there until officers from Internal Affairs arrived, and they were not allowed to use their cell phones. The officers were questioned about the missing money, asked to remove their jackets, told to pull down their socks, directed to open their wallets, and told that cooperation would be in their "best interest." They did as they were told the whole time because the orders came from their superiors, and also because they feared discipline and possible loss of employment. *Id.* at 298. When the officers were allowed to leave and returned to their lockers, it appeared that their lockers had been searched. *Id.*

The Third Circuit concluded that the officers had not been seized. *Id.* at 302. It reasoned that to the extent the officers felt compelled to obey their superiors' commands, that compulsion was the result of their employment relationship, not the fear of arrest or detention. *Id.* The court found no suggestion that the officers were under a criminal investigation, and it pointed out that the officers were asked to wait to speak to Internal Affairs representatives. Under the circum-

stances, the court found the officers did not reasonably fear detention and were not seized. *Id.*

Similarly here, no seizure occurred. Although Carter contends he was under criminal investigation, the record does not support him. Carter asserts that Eccher admitted in his deposition that Carter was under criminal investigation. But a full read of the deposition transcript reflects otherwise. When asked whether Carter was under internal or administrative investigation, Eccher initially stated that it was a criminal investigation as far as he was concerned. But Eccher then qualified his statement, stating, "Well, there [were] criminal allegations being made." When he was next explicitly asked to say that "yes," Carter was under criminal investigation, Eccher replied that he could not answer "yes" or "no." He later explained, "Again, I guess I'm walking a fine line here. I don't think this was an investigation as much as it was – as – I was trying to remove them from suspicion." Eccher did not, therefore, testify in his deposition that Carter was under criminal investigation. Nor is there any other suggestion in the record to support that position. Eccher did not read Carter his rights or inform him he was under criminal investigation. Eccher did not perform other activities consistent with a criminal investigation such as interviewing witnesses. Instead, at the time, Eccher was in a holding pattern, waiting for PPD to arrive.

While Carter is not maintaining that he feared only job consequences, the bottom line is that a reasonable person in Carter's position would not have feared arrest or detention if he had declined to be patted down or searched. *Cf. Feirson v. District of Columbia*, 506 F.3d 1063, 1067 (D.C. Cir. 2007) ("The relevant inquiry is whether a reasonable person would have

believed he would be detained if he disobeyed his supervisor's order—not whether he feared negative consequences for his job."). As we discussed, Eccher did not tell Carter he was the subject of a criminal investigation, nor is there any indication that he was. He did not read Carter his rights. He did not threaten arrest if Carter refused to be searched. He did not touch Carter to stop him from leaving. (He only came into contact with Carter during the pat-down.) There is also no evidence to support a finding that had Carter asked him to stop, the lieutenant would not have done so. In fact, when Officer Lopez told Lieutenant Eccher he would not take his boots off, the lieutenant did not make him do so.

Carter was a thirteen-year veteran of the police force and certainly knew his constitutional rights. *Cf. Driebel*, 298 F.3d at 647 ("Officer Huston was not some naïve, awestruck individual confronting the police for the first time. Rather, he was a sworn, highly trained law enforcement officer, who, we believe, was well aware of his constitutional and workplace rights."). Carter and Lopez agreed to be searched so that Carter could return to the police station to use the restroom there. And Lieutenant Eccher agreed to let them leave despite the freeze order, so long as they were searched first. Although Carter may have felt it necessary to agree to the search because he needed to use the restroom badly, that does not mean he was seized by Eccher. A reasonable officer in Carter's position would not have feared arrest or detention had he not complied. Therefore, we agree with the district court that Carter was not seized.

Carter's only argument that the search was unlawful is that because his seizure was unlawful, the search was presumptively unlawful too. Because we have rejected the

premise of this position in finding that Carter was not seized, we do not need to go further. We uphold the grant of summary judgment in the defendants' favor.[1] We note that Officer Lopez was a plaintiff in this lawsuit, and his name appears on the appellate brief. But no argument was raised regarding him on appeal, so any argument on his behalf is waived. *See Carroll v. Lynch*, 698 F.3d 561, 568 (7th Cir. 2012). In any event, he would lose for the same reasons as Officer Carter.

### III. CONCLUSION

The judgment of the district court is AFFIRMED.

---

[1] We note that the defendants maintain that conducting the pat-down and search of the items in Officer Carter's possession before letting Carter leave was reasonable. In light of the resident's allegation that an officer had taken his money and Carter's request to leave during the freeze order, Eccher explained that he searched Officers Carter and Lopez for several reasons, including to remove them from suspicion. He also explained that they had means and access to the money. Carter and Lopez had searched the northwest bedroom, the same room from which Mitchell alleged his money had been taken, and they had performed the search without a supervisor present. Carter emphasizes that the resident alleged that a white male officer with a helmet stole his money. Carter, unlike the tactical enforcement officers, was not wearing a helmet, and Carter is African American. But Carter crossed paths with the tactical enforcement officers on his way into the residence, so there was an opportunity for a tactical enforcement officer to pass money on to one or more officers involved in the search. Eccher also stated that Carter and Lopez did not say they needed to leave to use the restroom until they learned that PPD Criminal was coming.