RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 26a0046p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

JENNIFER KILNAPP,

*Plaintiff-Appellee,*

*v.*

No. 25-3149

CITY OF CLEVELAND, OHIO,

*Defendant,*

BAILEY GANNON,

*Defendant-Appellant.*

─────────────────

Appeal from the United States District Court for the Northern District of Ohio at Cleveland.
No. 1:22-cv-01225—Christopher A. Boyko, District Judge.

Argued:  October 23, 2025

Decided and Filed:  February 18, 2026

Before:  MOORE, BUSH, and DAVIS, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:**  James R. Russell, Jr., CITY OF CLEVELAND, Cleveland, Ohio, for Appellant.
Matthew D. Besser, BOLEK BESSER GLESIUS LLC, Cleveland, Ohio, for Appellee.  **ON
BRIEF:**  James R. Russell, Jr., Affan Ali, CITY OF CLEVELAND, Cleveland, Ohio, for
Appellant.  Matthew D. Besser, BOLEK BESSER GLESIUS LLC, Cleveland, Ohio, for
Appellee.

        MOORE, J., delivered the opinion of the court in which DAVIS, J., concurred.  BUSH, J.
(pp. 23–31), delivered a separate opinion concurring in part, dissenting in part, and concurring in
the judgment.

_____

**OPINION**

_____

KAREN NELSON MOORE, Circuit Judge.   Plaintiff Jennifer Kilnapp brought this action against Defendants Bailey Gannon and the City of Cleveland, alleging in relevant part that Gannon used excessive force against her in violation of her Fourth Amendment rights when he shot her while the two were on duty as City of Cleveland police officers.  Gannon intentionally fired his weapon in response to the threat posed by a suspect.  He did not specifically intend to shoot Kilnapp.  But that latter fact is immaterial to the question of whether Kilnapp was seized. We hold today that when an officer intentionally shoots their firearm in circumstances that objectively manifest an intent to restrain, any individual struck by the bullet is thereby seized, regardless of whether that individual was the officer's specific intended target.  Because this law was not clearly established at the time of Kilnapp's shooting, however, we conclude that Gannon is entitled to qualified immunity on Kilnapp's Fourth Amendment claim.   We therefore **VACATE** the decision of the district court and **REMAND** for further proceedings.

**I.  BACKGROUND**

**A.  Factual Background**

In the early morning on July 20, 2020, Plaintiff Jennifer Kilnapp and Defendant Bailey Gannon, police officers with the City of Cleveland, responded to a call about a man (later identified as Darryl Borden) armed with a gun at a boarding house in Cleveland.  D. 12 (Appellant Br. at 5); D. 13 (Appellee Br. at 4).  The officers were told by dispatch that a woman reported that a man had shot a hole in the floorboards.  R. 77 (D. Ct. Op. 2/13/2025 at 1) (Page ID #3966).  When the officers arrived, the building was completely dark.  *Id.*; *see generally* R. 67 (Ex. B, Body Cam Video) [hereinafter Body Cam Video].  Although both officers activated their body cameras, only Gannon's turned on.  R. 77 (D. Ct. Op. 2/13/2025 at 1–2) (Page ID #3966–67); R. 60-1 (Kilnapp Dep. at 70:9–13) (Page ID #1144).  The officers entered the building with their firearms drawn—Kilnapp's firearm had an attached flashlight and "[Gannon] had a flashlight in his right hand and his firearm in his dominant left hand."  R. 77 (D. Ct. Op.

2/13/2025 at 1) (Page ID #3966); R. 60-1 (Kilnapp Dep. at 36:11–18) (Page ID #1110); R. 59-1 (Gannon Dep. at 63:23–25) (Page ID #892).  They approached the staircase to the second floor.  "The staircase had two flights: a set going up in one direction, followed by a landing, and then a second set going up in the opposite direction."  D. 13 (Appellee Br. at 4); R. 77 (D. Ct. Op. 2/13/2025 at 2) (Page ID #3967).

Gannon proceeded up the stairs first, followed by Kilnapp.  R. 77 (D. Ct. Op. 2/13/2025 at 2) (Page ID #3967).  Neither officer identified themselves as police as they moved through the house.  *Id*.  Kilnapp twice called out "Moose," Borden's nickname.  *Id.*; Body Cam Video at 1:18, 1:35.  Once upstairs, the female caller yelled to the officers from where she was downstairs that Borden was in the bathroom.  R. 77 (D. Ct. Op. 2/13/2025 at 2) (Page ID #3967).  The woman added that the bathroom was "behind [them]."  Body Cam Video at 1:35–1:39.  Gannon turned down a narrow hallway to the right of the staircase and encountered a door on the righthand side, which he opened.  R. 77 (D. Ct. Op. 2/13/2025 at 2) (Page ID #3967); R. 69 (Pl. Summ. J. Opp'n at 3) (Page ID #3210); R. 59-1 (Gannon Dep. at 116:23–117:2) (Page ID #945–46).

From this point, the Parties' accounts differ.[1]  Gannon alleges that when he opened the bathroom door he saw Borden standing "at full presentation" in "a firing range position"—that is, with both his arms raised in front of him, aiming a firearm at Gannon.  R. 59-1 (Gannon Dep. at 64:1–6) (Page ID #893); *see also id.* at 118:2–6 (Page ID #947) (stating that Borden was "facing the door or the hallway"); R. 77 (D. Ct. Op. 2/13/2025 at 2) (Page ID #3967).  Gannon "retreated," R. 59-1 (Gannon Dep. at 114:19) (Page ID #943), in "a quick fashion," *id.* at

---

[1]Although both Parties rely on it extensively, the body-cam-video evidence in this case is of limited utility. As to whether and how Borden presented a firearm, Gannon appears to assert that the video shows Borden lifting his right arm and pointing a firearm toward Gannon.  *See* R. 61 (Def. Gannon Summ. J. Mot. at 4) (Page ID #1292) (citing the video).  Kilnapp counters that the same video shows "Borden's left hand on the door itself when Gannon opens it, meaning he could not possibly have been holding the gun 'in both hands' with both arms high and outstretched."  D. 13 (Appellee Br. at 9).  Having reviewed the video many times, at various speeds (including as slowly as 0.12x), as well as frame by frame, we conclude that it does not clearly depict anything at all when the bathroom door opens, corroborating neither party's version of events.  *See* Body Cam Video at 1:49–1:51.  As to when and where Gannon fired, the body cam video does appear to show Gannon raising his left arm, which held his firearm, while making the turn at the landing.  *Id.* at 1:51–1:52.  The balusters of the first flight of stairs (down from the second floor to the landing) and the stairs behind them are visible, meaning that Gannon was facing them, moments after his left arm appears in frame.  At the time the balusters and stairs are visible, Gannon's arm is no longer in frame.  *Id.* at 1:52.

132:24–25 (Page ID #961), and turned and ran down the stairs. R. 77 (D. Ct. Op. 2/13/2025 at 2) (Page ID #3967). Gannon can be heard on the body cam video yelling (presumably to Kilnapp) "Get back." Body Cam Video at 1:50. "[G]unshots ensued soon after." R. 59-1 (Gannon Dep. at 79:16–17) (Page ID #908). According to Gannon, Borden fired shots first. *Id.* at 79:2–5, 80:13–15, 84:9–15 (Page ID #908, 909, 913). Gannon did not see Borden fire his weapon. *Id.* at 81:20–24 (Page ID #910). At some point while on the first flight of stairs, Gannon "tried to return fire in the direction of" Borden. *See id.* at 64:14–15 (Page ID #893). In initial, post-incident police interviews, Gannon reported that he fired at Borden while Gannon was still in the bathroom doorway. *Id.* at 70:1–3 (Page ID #899) ("Initially during those interviews, I thought I was standing at that door."). However, by the time of his deposition, Gannon recognized that his prior statement was inaccurate. *Id.* at 70:3–7, 115:12–21 (Page ID #899, 944).

Gannon testified at his deposition that he could not recall exactly where he was when he fired. *Id.* at 70:11–13, 115:22–116:4 (Page ID #899, 944–45). He was also unsure where he was holding his weapon relative to his face. *Id.* at 135:13–136:3 (Page ID #964–65). Gannon further testified that he could not recall whether he saw Borden at the time Gannon fired his weapon. *Id.* at 84:18–85:14 (Page ID #913–14). Nor could he recall whether he saw Borden leave the bathroom, *id.* at 116:12–15 (Page ID #945), or heard Borden chasing him, *id.* at 116:5–8 (Page ID #945). In response to Kilnapp's requests for admission, Gannon admitted that he "could not see Darryl Borden when [Gannon] opened fire" on the morning of the incident. R. 69-4 (Gannon Resp. to Reqs. for Admis. at 5) (Page ID #3608); *see also* R. 59-1 (Gannon Dep. at 124:22–23) (Page ID #953) ("I'm not saying I'm changing my answer."). Gannon agreed, based on the layout of the boarding house, that one would not be able to see into the bathroom once one was on the stairs or the landing. R. 59-1 (Gannon Dep. at 140:18–141:14) (Page ID #969–70).

Kilnapp disputes that Borden was pointing a gun at Gannon. *See* R. 77 (D. Ct. Op. 2/13/2025 at 8–9) (Page ID #3973–74); R. 69 (Pl. Summ. J. Opp'n at 4–5) (Page ID #3211–12). She did not, however, see Borden herself at any point, R. 60-1 (Kilnapp Dep. at 59:14–18) (Page ID #1133), and could not see into the bathroom, *id.* at 60:11–18 (Page ID #1134); R. 77 (D. Ct. Op. 2/13/2025 at 9) (Page ID #3974). Kilnapp does not concede that Borden shot first. Although Kilnapp previously stated in a police interview that she "thought [she] heard the shots

fired before [she] really started going down the stairs," R. 60-1 (Kilnapp Dep. at 43:13–21) (Page ID #1117), at her deposition she testified that she heard gunshots when she was standing at the top of the stairs on the second floor, *id.* at 63:12–21 (Page ID #1137). *See also id.* at 65:21–23 (Page ID #1139). According to Kilnapp, she felt extreme pain (from being shot) while descending the first flight of stairs. *Id.* at 44:22–45:7, 65:25–66:3 (Page ID #1118–19, 1139–40); R. 77 (D. Ct. Op. 2/13/2025 at 2) (Page ID #3967). She estimated that she felt the pain five or seven footsteps away from the bathroom door, on the first or second step of the first flight of stairs. R. 60-1 (Kilnapp Dep. at 66:17–67:18) (Page ID #1140–41). Kilnapp further testified at her deposition that she did not see anyone (including Borden) come out of the bathroom. R. 60-1 (Kilnapp Dep. at 43:2–4, 90:8–13) (Page ID #1117, 1164).

The Parties agree that Gannon fired two shots.[2] *See* R. 59-1 (Gannon Dep. at 68:12–20) (Page ID #897); R. 69 (Pl. Summ. J. Opp'n at 7) (Page ID #3214). Gannon's first shot was intentional. *See* R. 59-1 (Gannon Dep. at 78:5–7) (Page ID #907) ("[M]y intent at the time was to fire upon Mr. Borden."); *id.* at 132:6–10 (Page ID #961) ("My – obviously my objective [with the first trigger pull] was to stop the threat of Mr. Borden."); *id.* at 69:23–25 (Page ID #898) ("I tried my best to protect myself and Officer Kilnapp by returning fire."); *id.* at 130:11–15 (Page ID #959); R. 69 (Pl. Summ. J. Opp'n at 9) (Page ID #3216); R. 77 (D. Ct. Op. 2/13/2025 at 2) (Page ID #3967). The Parties agree that this first round in fact hit Kilnapp as she was running behind Gannon. R. 69 (Pl. Summ. J. Opp'n at 9) (Page ID #3216); R. 59-1 (Gannon Dep. at 72:14–19) (Page ID #901) ("I believe the one that struck [Kilnapp] is the one that I fired in defense trying to protect . . . her and myself from . . . Mr. Borden, the suspect."). That "bullet went into and through Kilnapp's forearm, exited upward, hit her bicep, entered her right armpit and lodged in her back." D. 12 (Appellant Br. at 7); R. 69 (Pl. Summ. J. Opp'n at 9) (Page ID #3216).

The Parties further agree that Gannon "ducked" as he retreated and fired a second shot. R. 77 (D. Ct. Op. 2/13/2025 at 2) (Page ID #3967). Gannon describes this second shot as

---

[2]Ballistics evidence shows that Borden at some point fired two shots that traveled through the bathroom door and lodged in the hallway wall across from the bathroom. R. 60-1 (Kilnapp Dep. at 86:15–17) (Page ID #1116); R. 69 (Pl. Summ. J. Opp'n at 10) (Page ID #3217); *see also* R. 69-1 (Bureau of Criminal Investigation Scene Documentation Report at 4–5) (Page ID #3235–36).

inadvertent.  *See* R. 59-1 (Gannon Dep. at 67:22–68:1) (Page ID #896–97).  Gannon testified at his deposition that he did not recall exactly where he was when he fired the inadvertent shot, although he thought he knew in previous police interviews.  *Id.* at 68:23–69:9 (Page ID #897–98).  Kilnapp disputes whether the second shot was accidental, noting that Gannon's weapon "require[d] additional force to pull the trigger."  R. 69 (Pl. Summ. J. Opp'n at 9 n.2) (Page ID #3216).  "[A]t some point" while "retreating down the stairs," Gannon checked that Kilnapp was "trailing behind" him and "exiting the building with [him]."  R. 59-1 (Gannon Dep. at 128:14–129:5) (Page ID #957–58).  Gannon testified that he could not recall whether he checked that Kilnapp was behind him before or after he pulled the trigger.  *Id.* at 129:9–13 (Page ID #958).

**B.  Procedural Background**

Kilnapp filed the instant case against Gannon in his official and personal capacity, the City of Cleveland, and Dornat Drummond in his official capacity as City of Cleveland Chief of Police.  R. 1 (Compl. at 1) (Page ID #1).  The complaint asserts two claims for relief:  one for excessive force under the Fourth Amendment, and one for excessive force under the Fourteenth Amendment.  *Id.* at 16–19 (Page ID #16–19).  Gannon answered the complaint in his personal capacity, R. 14 (Answer) (Page ID #70), and moved for judgment on the pleadings the same day, arguing that he was shielded from suit by qualified immunity and entitled to dismissal of Kilnapp's claims against him.  R. 15 (Mot. Judgment on the Pleadings) (Page ID #83).  The district court denied Gannon's motion.  R. 29 (D. Ct. Op. 12/9/22) (Page ID #397).  Gannon appealed, and a prior panel of this court affirmed the district court's decision.  *Kilnapp v. City of Cleveland*, No. 22-4059, 2023 WL 4678994 (6th Cir. July 21, 2023).  Gannon then petitioned for rehearing and rehearing en banc.  *See* Def.-Pet'r Bailey Gannon's Pet. for Rehr'g with Suggestion for Reh'rg En Banc, *Kilnapp v. City of Cleveland* (No. 22-4059) (R. 27).  The court denied the petition.

The Parties then proceeded to discovery.  Gannon moved for summary judgment, renewing his qualified-immunity arguments.  R. 61 (Def. Gannon Mot. for Summ. J.) (Page ID #1280).  The district court denied his motion.  R. 77 (D. Ct. Op. 2/13/2025) (Page ID #3966).  Gannon now appeals that order to this court.

## II.  JURISDICTION

We have jurisdiction to review the district court's denial of summary judgment on qualified-immunity grounds pursuant to the collateral-order doctrine.  *Mitchell v. Forsyth*, 472 U.S. 511, 526–27 (1985).  "This Court's jurisdiction regarding orders denying qualified immunity, however, is narrow."  *Harrison v. Ash*, 539 F.3d 510, 517 (6th Cir. 2008).  Review "is limited to 'only purely legal questions.'"  *Gordon v. Bierenga*, 20 F.4th 1077, 1081 (6th Cir. 2021) (quoting *McGrew v. Duncan*, 937 F.3d 664, 669 (6th Cir. 2019)).  A defendant seeking interlocutory review "may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Johnson v. Jones*, 515 U.S. 304, 319–20 (1995).  "[T]o the extent that the denial of qualified immunity is based on a factual dispute, such a denial falls outside of the narrow jurisdiction of this Court."  *Harrison*, 539 F.3d at 517.  "[T]his limitation ensures that" appellate courts' review of such decisions "remains confined to the denials of qualified immunity and does not bleed over into a review of district courts' evaluation of genuine disputes of material fact."  *Brown v. Chapman*, 814 F.3d 436, 444 (6th Cir. 2016).  Where a denial of qualified immunity is based on a factual dispute, a defendant may nonetheless "invoke [this court's] jurisdiction by conceding the plaintiff's version of the facts."  *Anderson-Santos v. Kent County*, 94 F.4th 550, 554 (6th Cir. 2024); *id.* ("A defendant who adopts the plaintiff's view can proceed before us by arguing that, even assessing the facts in the light most favorable to the plaintiff, there was no violation of the plaintiff's clearly-established rights.").

## III.  DISCUSSION

### A.  Standard of Review and Background Legal Principles

We review de novo a district court's denial of summary judgment based on qualified immunity.  *Clark v. Abdallah*, 131 F.4th 432, 444 (6th Cir. 2025).  "A public official is entitled to qualified immunity at summary judgment when, viewing the facts in the light most favorable to the plaintiff, the challenged conduct did not violate 'clearly established . . . constitutional rights of which a reasonable person would have known.'"  *Heeter v. Bowers*, 99 F.4th 900, 908 (6th Cir. 2024) (alteration in original) (quoting *Jackson v. City of Cleveland*, 64 F.4th 736, 745

(6th Cir. 2023)). In this case Kilnapp alleges that Gannon violated her Fourth Amendment right to be free from excessive force.[3] "The Fourth Amendment protects individuals from unreasonable seizures, which includes those involving excessive force by law enforcement officers." *Guptill v. City of Chattanooga*, 160 F.4th 768, 776 (6th Cir. 2025). To be constitutional, a use of force must be "objectively reasonable." *Graham v. Connor*, 490 U.S. 386, 397 (1989). Under *Graham*, factors to be considered when assessing reasonableness include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.

## B. Law of the Case

We first address the preliminary matter of whether we are bound by the prior panel's decision pursuant to the law-of-the-case doctrine. Under that doctrine, "a court 'should not reconsider' a legal issue it 'resolved' at a prior stage of the same case." *Ermold v. Davis*, 130 F.4th 553, 559 (6th Cir. 2025) (quoting *Howe v. City of Akron*, 801 F.3d 718, 739 (6th Cir. 2015)). That is, "when the '*same* issue' is presented 'in the *same case*' to the '*same court*,' the '*same result*' should follow." *Id.* (quoting *Howe*, 801 F.3d at 739). In general, there are three exceptions to the law-of-the-case doctrine: "(1) where substantially different evidence is discovered between appeals, (2) where the controlling legal precedent changes between appeals, and (3) where a decision is clearly erroneous and would work a manifest injustice." *Id.* (internal citation and quotation marks omitted). The doctrine, however, "is not an inexorable command," *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 141 F.4th 796, 803 (6th Cir. 2025) (citation modified), and "we recognize that" the doctrine "is discretionary when applied to a coordinate court or the same court's own decisions," *Bowles v. Russell*, 432 F.3d 668, 677 (6th Cir. 2005) (citation omitted), *aff'd on other grounds*, 551 U.S. 205 (2007). In this case, a prior panel of this court reviewing the district court's denial of Gannon's motion to dismiss held that Kilnapp properly alleged that she was seized under the Fourth Amendment when she was shot by

---

[3]It is irrelevant that Kilnapp herself was also a law-enforcement officer at the time of the shooting. "[P]olicemen . . . are not relegated to a watered-down version of constitutional rights." *Garrity v. New Jersey*, 385 U.S. 493, 500 (1967); *Pennington v. Metro. Gov't*, 511 F.3d 647, 651 (6th Cir. 2008) ("The Fourth Amendment's prohibition against 'unreasonable searches and seizures' . . . applies to police officers.")

Gannon and "allege[d] sufficient facts to establish that Gannon's behavior was objectively unreasonable." *Kilnapp*, 2023 WL 4678994, at *5.

Gannon argues that the doctrine does not apply here because the prior appeal was decided under a different standard and on an undeveloped factual record. D. 14 (Appellant Reply at 7–9). Gannon points to several allegations in Kilnapp's complaint previously assumed to be true that Gannon asserts "are now confirmed to be completely unsupported by the evidence produced during discovery." *Id.* at 9–12. In particular, Gannon directs us to the complaint's allegation that Gannon shot Kilnapp under the mistaken belief that she was Borden and was following Gannon. *Id.* at 11. He argues that this allegation did not survive discovery, and that this changed fact is determinative and thus warrants departure from the law-of-the-case doctrine. Contrary to Gannon's assertion, we conclude that whether or not this is a case of mistaken identity is irrelevant. But because determining whether the law-of-the-case doctrine is appropriate here in fact requires an examination of the merits, we forgo the former and proceed to the latter. *See Daunt v. Benson*, 999 F.3d 299, 308 (6th Cir. 2021) ("[T]he law-of-the-case doctrine . . . is primarily 'intended to enforce a district court's adherence to an appellate court's judgment, and so is applied only loosely when we reconsider our own decisions.'" (quoting *Moody v. Mich. Gaming Control Bd.*, 871 F.3d 420, 425 (6th Cir. 2017))).

## C. Violation of Constitutional Rights

### 1. Seizure of Kilnapp

This case begins and ends with the question of whether Kilnapp was seized within the meaning of the Fourth Amendment when she was struck by the bullet Gannon fired. The central issue we must resolve is whether a police officer "seizes" an individual when the officer intentionally fires their gun with an intent to restrain and the bullet hits an individual if that individual was not the particular target of their firing. Cases involving such so-called unintended-target shootings have bedeviled our sibling circuits, generating circuit splits and unprincipled line-drawing. But we now have the benefit of the Supreme Court's recent decision in *Torres v. Madrid*, 592 U.S. 306 (2021). With *Torres*, Supreme Court caselaw makes plain the answer: When an officer intentionally shoots their firearm in circumstances that objectively

manifest an intent to restrain, any individual struck by the bullet is thereby seized, regardless of whether that individual was the officer's specific intended target.

We begin with the relevant Supreme Court caselaw. First, in *Brower v. County of Inyo*, the Supreme Court stated that "[a] seizure occurs even when an unintended person or thing is the object of the detention or taking, but the detention or taking itself must be willful." 489 U.S. 593, 596 (1989) (internal citations omitted). A seizure, therefore, does not occur via "an unknowing act[,]" *id.*, but only via "a governmental termination of freedom of movement *through means intentionally applied*." *Id.* at 596–97. Building on this proposition from *Brower*, the Court in *Brendlin v. California* held that a passenger in a vehicle is seized when that vehicle is stopped by police. 551 U.S. 249, 263 (2007). In *Brendlin*, police officers pulled a vehicle over in a routine traffic stop to verify that a temporary operating permit matched the vehicle. *Id.* at 252. An officer recognized a passenger (Brendlin) and, after the officer returned to his cruiser, confirmed that Brendlin "was a parole violator with an outstanding no-bail warrant for his arrest." *Id.* The officer returned to the vehicle and ordered Brendlin out. Upon searching Brendlin incident to his arrest, officers found drug paraphernalia on Brendlin's person and in the vehicle. *Id.* In his subsequent prosecution, Brendlin moved to suppress the evidence as fruits of an unconstitutional seizure. *Id.* at 253. The Supreme Court of California held that Brendlin, as only a passenger in the vehicle and not the vehicle's driver, was not seized by the traffic stop. *Id.* at 253–54. The Supreme Court of the United States reversed, unanimously.

The Court in *Brendlin* stated that "[a] person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement *through means intentionally applied*." *Id.* at 254 (citation modified). "Thus, an 'unintended person . . . [may be] the object of the detention,' so long as the detention is 'willful' and not merely the consequence of 'an unknowing act.'" *Id.* (alterations in original) (quoting *Brower*, 489 U.S. at 596). The Court then turned to *United States v. Mendenhall* as supplying the "test" for determining "when a seizure occurs in response to authority, and when it does not." *Id.* at 255. *Mendenhall* states a reasonable-person test: "a seizure occurs if 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not

free to leave.'" *Id.* (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). Applying that test, the *Brendlin* Court concluded that "any reasonable passenger would have understood the police officers to be exercising control to the point that no one in the car was free to depart without police permission." *Id.* at 257.

The *Brendlin* Court rejected the California Supreme Court's reasoning that there was no evidence that the officer even knew Brendlin was in the vehicle before the stop: "[T]hat view of the facts ignores the objective *Mendenhall* test of what a reasonable passenger would understand." *Id.* at 259–60. The state court's approach improperly "shift[ed] the issue from the intent of the police as objectively manifested to the motive of the police for taking the intentional action to stop the car, and we have repeatedly rejected attempts to introduce this kind of subjectivity into Fourth Amendment analysis." *Id.* at 260. The Court then explained how its prior decisions in *Brower* and *County of Sacramento v. Lewis* were in accord with its reasoning. In *Lewis,* no seizure had taken place because "the officer stopped Lewis's movement by accidentally crashing into him, not 'through means intentionally applied.'" *Id.* at 261 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 844 (1998)). And in *Brower,* the Court's "point was not that Brower alone was the target but that officers detained him 'through means intentionally applied'; if the car had had another occupant, it would have made sense to hold that he too had been seized when the car collided with the roadblock." *Id.*

For many years, *Brendlin* was lower courts' primary guide in unintended-target-shooting cases. It was, it turns out, an imperfect guide, and its application led to splits of authority. In 2021, the Supreme Court decided *Torres v. Madrid*. There, the plaintiff was shot by police while fleeing, but that did not immediately terminate her flight. She fled the scene and was not arrested until the following day. 592 U.S. at 309–10. The Supreme Court held that the plaintiff was seized when shot, even though that force "d[id] not succeed in subduing" her. *Id.* at 309. In so holding, the Court emphasized that there are two types of seizures: seizure by *force* and seizure by *control*. *See id.* at 322. Importantly, the common law distinguished the former from the latter—seizure by force "enjoys a separate common law pedigree that gives rise to a separate rule" from seizure by control. *Id.* The majority faulted the dissent for "improperly eras[ing] the distinction between" the two. *Id.* "[A] seizure by acquisition of control," the Court explained,

"involves either voluntary submission to a show of authority or the termination of freedom of movement," and "actual control is a necessary element for this type of seizure." *Id*. "But that requirement of control or submission never extended to seizures by force." *Id.*

The Court stressed that not "every physical contact between a government employee and a member of the public" is a Fourth Amendment seizure. *Id.* at 317. Per the proper common-law rule, "[a] seizure requires the use of force *with intent to restrain*. Accidental force will not qualify. . . [,] [n]or will force intentionally applied for some other purpose." *Id.* (citing *Lewis*, 523 U.S. at 844). Furthermore, the Court instructed, "the appropriate inquiry is whether the challenged conduct *objectively* manifests an intent to restrain, for we rarely probe the subjective motivations of police officers in the Fourth Amendment context." *Id.* "[T]he subjective perceptions of the seized person" also do not determine the seizure. *Id.* The Court concluded that the plaintiff was seized by force when she was shot. *Id.* at 318.

There are several lessons to be drawn from *Torres*. First, courts ought to disambiguate seizures by force and seizures by control. As the *Torres* Court acknowledged, it "ha[s] not always been attentive to this distinction when a case did not implicate the issue." *Id.* at 322 (citing *Brendlin*, 551 U.S. at 254). But the common law "distinguished" the two, and they retain distinct features in modern constitutional jurisprudence. *Id.* at 311. Second, a seizure by force requires intent to restrain. That is, the potentially seizing act by an officer must be done intentionally, as in non-accidentally, and with an intent to restrain, not "for some other purpose." *Id.* at 317. Finally, intent must be determined by dint of the *objective* circumstances, not the officer's *subjective* intent. *Id.*

Straightforward application of these principles in the instant case leads to the clear conclusion that Gannon seized Kilnapp. The seizure at issue is unequivocally one by force. *See id.* at 316–17; *see also Tennessee v. Garner*, 471 U.S. 1, 7 (1985); *Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2006); *Yatsko v. Graziolli*, Nos. 20-3574/3576/3643, 2021 WL 5772527, at *6 (6th Cir. Dec. 6, 2021). It is undisputed that Gannon fired his weapon intentionally, not

accidentally.**4**   And the circumstances objectively manifested an intent to restrain.   The two officers were responding to reports of an armed man.   Gannon encountered the suspect.   The two officers retreated.   Gannon fired his firearm.   *See Torres*, 592 U.S. at 317 (noting that "the amount of force remains pertinent in assessing the objective intent to restrain").   He fired his weapon in the direction of the suspect.   In these conditions, it cannot reasonably be disputed that the objective circumstances show that Gannon fired with intent to restrain.   Accordingly, when Gannon's bullet struck Kilnapp, she was seized.

Our own circuit precedent does not dictate a different conclusion.   Gannon hangs his hat on *Claybrook v. Birchwell*, 199 F.3d 350 (6th Cir. 2000).   There, the plaintiff challenged on appeal the district court's dismissal of only her Fourteenth Amendment due-process claim.   199 F.3d at 359.   Before addressing the substance of that claim, the court remarked that, although an excessive-force claim would normally be "assessed under Fourth Amendment objective reasonableness standards[,]" that standard "does not apply to section 1983 claims which seek remuneration for physical injuries *inadvertently inflicted upon an innocent third party* by police officers' use of force while attempting to seize a perpetrator, because the authorities could not 'seize' any person other than one who was a deliberate object of their exertion of force."   *Id.* (citation modified).   For this proposition, the court cited *Brower*.   The court continued, "constitutional tort claims asserted by persons collaterally injured by police conduct who were not intended targets of an attempted official 'seizure' are adjudged according to substantive due process norms."   *Id.* (citing *Lewis*, 523 U.S. 833).

This language from *Claybrook* was incidental to the court's holding and does not bind us now.   Indeed, one could excise the text in *Claybrook* beginning "[o]rdinarily" until the end of that paragraph without affecting the court's holding.   Because only the Fourteenth Amendment claim was actually before the court in *Claybrook*, the court's opining as to what is or is not covered under the Fourth Amendment is dicta and is not controlling on this court.   *See Williams v. United States*, 927 F.3d 427, 435–36 (6th Cir. 2019) ("[D]ictum in a prior decision . . . does not bind future panels." (quoting *In re Campbell*, 874 F.3d 454, 464 (6th Cir. 2017))).

---

**4**Although there is some dispute over Gannon's second shot, it is undisputed that his first shot, which is the one that struck Kilnapp, was not fired accidentally.

The dissent insists that *Claybrook* necessarily states a holding as to the Fourth Amendment because consideration of a Fourteenth Amendment claim is proper only where the Fourth Amendment is inapplicable.  *See* Dissent at 23–24.  But the fact remains that the *Claybrook* plaintiff brought only her Fourteenth Amendment claim to this court.  In so doing, she effectively conceded that she had no Fourth Amendment claim.  We merely followed that implicit concession.  It would have been exceedingly odd for the court to reach beyond the briefing and resurrect an unappealed claim.  In any event, and more fundamentally, *Claybrook* predates, and thus necessarily fails to take account of, both *Brendlin* and *Torres*.

Far from putting this court out on a limb, our decision today helps make sense of existing divisions among our sibling circuits.[5]  The same *Torres* principles that dictate the conclusion in this case can clarify the muddied water of previous lower-court decisions in other unintended-target cases.  The confused nature of this body of law can largely be attributed to a misapplication of the proper *objective* intent standard, inappropriate blurring of the two types of seizures, or a mixture of both errors.  Although some of these cases may seem far afield of the instant controversy, we think it important to highlight the *Torres* principles' effectiveness as a unifying rule of decision.  We therefore address the caselaw at some length before returning to the particular fact pattern at hand.

Compare, first, hostage shootings (in which an officer shoots a hostage while attempting to apprehend the hostage-taker) and mistaken-identity shootings (in which an officer shoots an individual whom he mistakenly believed to be the suspect).  Courts that have considered hostage cases have all held that the hostages were not seized.[6]  Courts considering mistaken-identity

---

[5]The dissent harps on a supposed 7 to 1 circuit split created by our decision.  This is pure hyperbole. Nearly all of the cases from our sibling circuits were decided before *Torres*, and many before even *Brendlin*.  As explained at length in the remainder of this opinion, many cases inappropriately muddled the analysis pertinent to seizures by force and by control, as was common pre-*Torres*, and which distinction the dissent acknowledges is meaningful.  *See* Dissent at 28.  In fact, the only circuits to have weighed in since *Torres* and with which we could plausibly be said to be creating a split are the Fifth and Eighth.  *Singleton v. Casanova*, No. 22-50327, 2024 WL 2891900, at *16 (5th Cir. June 10, 2024); *Irish v. McNamara*, 108 F.4th 715, 717 (8th Cir. 2024).  As we explain below, those decisions are not persuasive.  *See infra* at 17 n.8, 18–19.  Separately, the Ninth Circuit appears to be at odds with itself post-*Torres*.  *Compare Hawatmeh v. City of Henderson*, 159 F.4th 591 (9th Cir. 2025), *with Cheairs v. City of Seattle*, 145 F.4th 1233 (9th Cir. 2025), *and Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012).

[6]*Hawatmeh*, 159 F. 4th at 601   (holding that the hostage was not seized because the officers "were attempting to save" the hostage's life, not restrain him); *Childress v. City of Arapaho*, 210 F.3d 1154, 1155–57 (10th

cases, by contrast, have uniformly held that such circumstances do constitute a seizure.[7]  The divergent conclusions in the two types of cases can be explained by the courts' shared error in relying on the officer's *subjective* intent.  On the one hand, the flawed reasoning goes, hostages are not seized because the force was not directed specifically at them; on the other, individuals mistaken for an intended target are seized by force intentionally directed at them.

If the hostage and mistaken-identity cases represent opposite ends of the spectrum of specific-target intent, then innocent-bystander-shooting, canine-bite, and vehicle-passenger-shooting cases land somewhere in the middle, with courts facing similar fact patterns but reaching disparate conclusions.  Take, for example, cases addressing unintended-target canine bites.  In some cases, courts have held that an unintended person is seized by a canine bite because the canine is trained to bite the first person it finds, making the use of force purposeful.  In *Vathekan v. Prince George's County*, for example, a canine was released for search into a house where an unsuspecting woman (unknown to officers and lawfully present) was sleeping.  154 F.3d 173, 175–77 (4th Cir. 1998).  The canine bit the woman and she suffered serious injuries to her head and face.  *Id.* at 177.  Holding that the woman was seized when the dog bit

Cir. 2000) (holding that hostages who were passengers in a minivan driven by a suspect were not seized when officers' bullets struck the hostages because the officers "intended to restrain the minivan and the fugitives," not the hostages); *Medeiros v. O'Connell*, 150 F.3d 164, 169 (2d Cir. 1998) (holding that the hostage was not seized because he was "hit by a bullet intended for the hostage-taker," rendering it an "unintended consequence of government action" and the officers "did not intend to restrain [the hostage]" (citation modified)); *Schaefer v. Goch*, 153 F.3d 793, 796–97 (7th Cir. 1998) (holding that the hostage was not seized but not addressing the shot itself); *Landol-Rivera v. Cruz Cosme*, 906 F.2d 791, 795–96 (1st Cir. 1990) (holding that a hostage shot by police was not seized because the officers' action was not "directed toward" shooting the hostage as a "specific individual").

We previously held that hostages were not seized in a case concerning a seizure by *control*.  *Ewolski v. City of Brunswick*, 287 F.3d 492, 507 (6th Cir. 2002).

[7]*Belton v. Loveridge*, 129 F.4th 271, 277–78 (4th Cir. 2025) (holding that a police officer seized a fellow officer when she shot him believing him to be a suspect); *Milstead v. Kibler*, 243 F.3d 157, 163–64 (4th Cir. 2001) (holding that an officer seized an individual whom they shot mistakenly believing to be a suspect); *Curley v. Klem*, 298 F.3d 271, 279 (3d Cir. 2002); *Jensen v. City of Oxnard*, 145 F.3d 1078, 1083 (9th Cir. 1998); *Herndon v. Gillis*, No. 21-16720, 2022 WL 14935785, at *2–3 (9th Cir. Oct. 26, 2022); *see also, e.g.*, *Wilkins v. City of Oakland*, 350 F.3d 949, 955–56 (9th Cir. 2003) (addressing whether an officer's actions were objectively reasonable in mistaken-identity shooting of fellow officer without specifically addressing the initial seizure question); *Ngo v. Storlie*, 495 F.3d 597, 602–04 (8th Cir. 2007) (same). *Cf. Hill v. California*, 401 U.S. 797, 804–05 (1971) (recognizing that arrestee was seized in case of mistaken identity); *Miller v. Prince George's County*, 475 F.3d 621, 629–30 (4th Cir. 2007) (holding in probable-cause-for-arrest case that an individual was seized even though he was "mistakenly thought to be another"); *Nerio v. Evans*, 974 F.3d 571, 574–75 (5th Cir. 2020) (mistaken-identity arrest); *Blackwell v. Barton*, 34 F.3d 298, 302–04 (5th Cir. 1994) (same); *Sharp v. County of Orange*, 871 F.3d 901, 909–10 (9th Cir. 2017) (same).

her, the Fourth Circuit reasoned that the officer, once he had given his command, "intended the dog to find anyone in the house," knowing that the dog would "go in and bite someone." *Id.* at 178. Further, the officer knew that some person was behind the closed door where the woman was sleeping, so by allowing the dog to enter through that door he "intended that the dog *find and bite that person*." *Id.* "The seizure of [the plaintiff] was therefore purposeful, even if [the officer] would not have seized her had he known she was innocent. Since [the officer] intended the dog to seize [the plaintiff] because he thought she might be a burglar, he seized her for Fourth Amendment purposes even though she turned out to be innocent." *Id.* (citing *Hill*, 401 U.S. at 802–05) (citation modified).

The Ninth Circuit reasoned similarly in *Rogers v. City of Kennewick*, 206 F. App'x 657 (9th Cir. 2006). There, the court held that a man bitten by a police dog given a search (and bite) command while officers searched for someone else was seized by the bite. *Id.* at 658; *see Rogers v. City of Kennewick*, No. CV-04-5028-EFS, 2005 WL 8158740, at *2 (E.D. Wash. Mar. 21, 2005) (recounting the facts). Relying on *Brower*, the circuit court reasoned that "it is of no consequence that the officers were not looking for [the plaintiff] specifically, so long as their actions were intentional." *Rogers*, 206 F. App'x at 658. The officer "had control over the dog when it bit [the plaintiff], and [the officer] had effectively ordered the dog to find and bite the individual he was tracking. Therefore, under these factual assumptions, it is of no legal consequence whether [the officers] . . . intended to restrain [the plaintiff] specifically, or merely intended to restrain an unidentified person the officers were tracking . . . ." *Id.*

Reaching the opposite conclusion in *Dunigan v. Noble*, this court held that a woman was not seized when a police canine not given a bite command bit her while officers attempted to apprehend her son. 390 F.3d 486, 492–93 (6th Cir. 2004). The court quoted *Brower* for the proposition that a seizure "requires an intentional acquisition of physical control," implicating the Fourth Amendment only "when there is a governmental termination of freedom of movement *through means intentionally applied*." *Id.* at 492. The court reasoned that no evidence suggested the officer "introduced [the canine] into the home intending to seize Plaintiff or that he actually seized Plaintiff 'through means intentionally applied.'" *Id.* Additionally, the canine had not been commanded to bite. *Id.*

These cases can be harmonized by refocusing on a proper analysis of objectively manifested intent to restrain.  Although *Vathekan* focuses erroneously on the officer's subjective intent, the court nonetheless properly identified certain factors relevant to assessing whether the circumstances objectively manifested an intent to restrain, such as the officer's commands to the dog and the known presence of a person behind the door.  And in *Dunigan*, examination of the objective circumstances likely would have led to the same result the court reached:  the officer had not given a command to the dog, who was still on-leash at the time of the bite.  *Rogers* correctly reasons that the officer used force with intent to restrain, resulting in a seizure of the person to whom the force was applied.[8]

We can perform the same exercise for innocent-bystander-shooting cases.  As with the hostage cases, the bystander cases almost all err by considering the officer's subjective intent as to a specific target.  Courts have largely held that bystander shootings do not constitute seizures.[9]

---

[8]Post-*Torres*, the Eighth Circuit has held that an officer was not seized when bitten by a fellow officer's canine.  *Irish*, 108 F.4th at 717.  The court highlighted language from *Torres* that courts "*rarely probe*[] the subjective motivations of police officers" but observed, "[r]arely, not never."  *Id.* at 719.  The court stated that "[t]his qualified language is consistent with the Court's repeated observation that officers' subjective intent '*is relevant* to an assessment of the Fourth Amendment implications of police conduct' insofar as 'that intent has been conveyed to the person confronted.'"  *Id.* (citation omitted).  The Eighth Circuit reads too much into the *Torres* Court's invocation of "rarely."  The case that the court relies on for the proposition that subjective intent is relevant "to the extent that that intent has been conveyed to the person confronted," *Michigan v. Chesternut*, 486 U.S. 567, 575 n.7 (1988), predates the Supreme Court's decisions in *Brower*, *Brendlin*, and *Torres*.  More to the point, it is a seizure-by-*control* case.  As the Court has since made abundantly clear, seizure by control requires that the officer actually acquire control.  One consideration often relevant in such circumstances is whether a reasonable person under the circumstances would feel free to leave.  The notion that an officer's subjective intent is relevant *if conveyed to the individual* is therefore relatively uncontroversial (albeit somewhat unartfully worded in light of more recent Supreme Court caselaw).  But the requirement of actual control, and the considerations relevant thereto, do not apply in the case of seizures by *force*.  The *Irish* court thus improperly muddles the two types of seizures in injecting inappropriate subjectivity into its analysis.  *See also Hight v. Williams*, 164 F.4th 672, 673–77 (8th Cir. 2026) (relying on *Irish* and holding that there is no seizure "[w]hen an officer fires at a dog" and "the stray bullet hits [the dog's owner] instead").  The dissent claims that Gannon would not have seized Kilnapp even under *Hight*, which the dissent acknowledges "disclaim[s] the role of subjective intent in the seizure inquiry."  Dissent at 30 n.5.  But the court in *Hight* had a distinct task from ours, contending with an intended target of a *dog* versus an actual *human* victim.  The court reasoned that "[t]he only thing [the officer] conceivably intended to restrain was the dog, which is an effect, not a person."  *Hight*, 164 F.4th at 677 (citation modified).  We need not wrestle here with how intent to restrain may interact with non-human entities.

[9]*See, e.g.*, *Arruda ex rel. Arruda v. County of Los Angeles*, 373 F. App'x 798, 799–800 (9th Cir. 2010) (holding that an officer did not seize another officer by shooting him when he stepped into the line of fire because "none of the evidence . . . permit[ted] an inference that [the shot officer] could be mistaken for the suspect"); *Simpson v. City of Fork Smith*, 389 F. App'x 568, 571 (8th Cir. 2010) (holding that a bystander shot by an officer in a shootout with a suspect was not seized because there was "no evidence that [she] was struck by anything other than an errant bullet"); *Emanuel v. District of Columbia*, 224 F. App'x 1, 2 (D.C. Cir. 2007) (holding that the officer

Two cases, however, hold otherwise.  In *Singleton v. Casanova*, a police officer fired two shots into the living room of a house, allegedly aiming at a particular individual whom he believed had a gun.  No. 22-50327, 2024 WL 2891900, at \*16 (5th Cir. June 10, 2024).  One bullet struck the intended target, and the other bullet struck and killed another individual also in the room.  *Id.* The officer argued that, because he aimed at and intended to hit the allegedly armed individual, the decedent was not "seized."  *Id.*  The Fifth Circuit noted that in some circumstances, "an officer's intentional conduct may target more than one person."  *Id.* at \*17.  The court concluded that it was unclear from the evidence whether the armed individual was the police officer's "*only* target*," or whether the shots fired were intended for others instead of or in addition to the allegedly armed person.  *Id.*  The court therefore remanded on that issue.  *Id.*  In *Moore v. Indehar*, an officer shot at a fleeing, armed suspect and hit another fleeing suspect, the plaintiff, who was running ahead of the first.  514 F.3d 756, 758 (8th Cir. 2008).  The court concluded that a reasonable jury could find that the officer intentionally shot the plaintiff "in an effort to effect his apprehension," such that the plaintiff was seized.  *Id.* at 761–62.  Again, *Singleton*, *Moore*, and the cases finding no seizure of a shot bystander all incorrectly rely on the officer's subjective intent as to specific target.  *Torres*'s application would lead to more uniform results.

From this survey of caselaw,[10] it is clear that no intelligible principle categorically distinguishes the mistaken-identity-shooting cases from the hostage-shooting and bystander-

---

did not seize a passenger when he shot through the car she was sitting in, aiming at an armed plainclothes officer, because "[t]here is no evidence that [the shooting officer] intended to shoot [the passenger]"); *Rucker v. Harford County*, 946 F.2d 278, 281 (4th Cir. 1991) (holding that a bystander shot by an officer who was aiming at the tires of a suspect's vehicle was not seized because he "was not the intended object of the shooting by which he was injured"); *see also Blair v. City of Dallas*, 666 F. App'x 337, 341–42 (5th Cir. 2016) (holding that a woman and her child were not seized where an officer fired into their apartment and did not hit them because the officer did not know they were inside and his use of force, therefore, was not "deliberately applied" to them).

[10]Vehicle-passenger shootings present another common type of unintended-target cases.  As the Supreme Court recognized in *Plumhoff v. Rickard*, circuit courts have reached differing conclusions as to whether a passenger in a vehicle who is shot by police is thereby seized.  572 U.S. 765, 778 n.4 (2014).  Some courts, including our own on two occasions, have held that that a passenger is seized because the officers intended to stop the entire vehicle. *Rodriguez v. Passinault*, 637 F.3d 675, 686–87 (6th Cir. 2011); *Fisher v. City of Memphis*, 234 F.3d 312, 317–19 (6th Cir. 2000).  Most other circuits have reached the same conclusion.  *See, e.g.*, *Villanueva v. California*, 986 F.3d 1158, 1167 (9th Cir. 2021); *Davenport v. Borough of Homestead*, 870 F.3d 273, 279 (3d Cir. 2017); *Vaughan v. Cox*, 343 F.3d 1323, 1328–29 (11th Cir. 2003).  *But see Schultz v. Braga*, 455 F.3d 470, 479–81 (4th Cir. 2006) (holding that a passenger shot through the vehicle window at a traffic stop was not seized, relying on hostage cases).  Many of the vehicle-passenger cases err by blending and confusing seizure-by-control and seizure-by-force, and by focusing incorrectly on subjective intent.  Because these cases are often more accurately characterized as seizure-by-control cases, they are particularly poor guides for the instant matter.

shooting cases.  Cases implicating seizures by force should be analyzed in light of *Torres*.  Per *Torres*, it matters not what an officer subjectively intended when he deliberately deployed force; rather, the pertinent question is whether the circumstances *objectively* manifest an intent to restrain.  The present case well demonstrates the inherent difficulty in relying on an officer's subjective intent.  At oral argument, the Parties bitterly contested whether Kilnapp was able to continue to advance a theory that Gannon shot her believing her to be Borden—that is, whether this is a mistaken-identity case.  Oral Arg. 5:35–6:44, 7:47–8:22, 15:12–16:43, 18:15–18:37, 30:24–31:24.

As it stands, the evidence in the record suggests that we will never, and can never, know for certain one way or the other whether this is a mistaken-identity case.  Gannon testified repeatedly in his deposition that he does not remember who or what he did or did not see at the time he fired his weapon.  The only way we could determine whether this was a case of mistaken identity would be to get into Gannon's head at the time of the shooting.  This is, of course, impossible, and is precisely the kind of subjectivity the Court unequivocally eschewed in *Torres*.  What we can do is what the *Torres* Court instructs we must:  determine whether the circumstances objectively manifested an intent to restrain.[11]  *See Watkins v. Davis*, 156 F.4th 1084, 1102 (11th Cir. 2025) (applying *Torres*'s objective test); *see also Gardner v. Bd. of Police Comm'rs*, 641 F.3d 947, 952–53 (8th Cir. 2011) (applying an objective test per *Brendlin*).  Here, the circumstances objectively manifest an intent to restrain.

We emphasize that the requirement of an objective intent to restrain is a true limitation on the scope of "seizure by force."[12]  Consider, for example, a bystander struck by a police officer's bullet fired while the officer is training at a shooting range.  True, the officer fired their weapon intentionally.  But that is not sufficient to effect a seizure.  The objective circumstances in such an instance would rarely exhibit an intent to restrain.  As another example, imagine a police

---

[11]The dissent accuses us of making too much of this language from *Torres*.  *See* Dissent at 26.  But the dissent hangs entirely on the word "rarely."  The dissent takes the *Torres* Court's hedge about "rare" circumstances in which an officer's subjective intent is relevant as carte blanche to make subjectivity into an all-encompassing and determinative principle.

[12]We grappled with "intent to restrain" in a pre-*Brendlin* and *Torres* case.  *Ciminillo v. Streicher*, 434 F.3d 461, 465–66 (6th Cir. 2006).  Without *Brendlin* and *Torres* to guide it, that case muddled seizure by control and seizure by force and is not helpful here.

officer responding to a protest.  The crowd has not responded to orders to leave.  The officer fires their gun up into the air.  Unfortunately, the bullet strikes someone on its descent.  The objective circumstances will dictate whether that person was seized.  Perhaps the crowd is peaceful, but obstructing traffic.  Officers have several times ordered the crowd to leave the area without effect.  The officer points their weapon and fires directly in the open air above the officer.  In such a situation, a factfinder might reasonably conclude the officer's conduct does not manifest an intent to restrain, but rather an intent to disperse, for example.  *Cf. Cheairs v. City of Seattle*, 145 F.4th 1233, 1241–43 (9th Cir. 2025) (applying *Torres* and holding that whether circumstances objectively manifested an intent to restrain in a case of an individual injured by a blast ball thrown by an officer was not resolvable on summary judgment).  On the other hand, if we modify the facts such that the protest has become a riot, other officers are using takedowns, and the officer in question fires their gun generally toward the crowd and strikes someone, a factfinder might reasonably conclude that that conduct manifests an intent to restrain.[13]  *Cf. Sanderlin v. Dwyer*, 116 F.4th 905, 912–13 (9th Cir. 2024) (applying *Torres* and holding that the circumstances objectively manifested an intent to restrain in a case of an individual injured by a foam baton fired by an officer).

We also reiterate that the fact of a seizure does not alone establish a Fourth Amendment violation—the seizure must be *unreasonable*.[14]  Without a doubt, there will be many cases in which an unintended target shot by police is seized, but the officer's use of force was objectively reasonable and thus did not violate the individual's Fourth Amendment rights.  One could imagine that many hostage-shooting cases might fall into this category, for example.  Our holding today does not suggest that every hostage shooting is automatically a Fourth Amendment violation, but that courts should not improperly torture the seizure analysis and

---

[13]We do not intend to express a position on the correct outcomes in circumstances like those presented in the hypotheticals.  Nor do we address any possible implications of the hypotheticals as regards seizure by control, or regarding the use of munitions other than firearms.

[14]On this subject, we take a moment to underscore the logical infirmity of the theory the dissent urges.  Consider a scenario in which an officer is pursuing a suspect on foot and the suspect runs into a densely packed crowd of people.  The officer responds by firing into the crowd, striking an unsuspecting member thereof.  As a matter of common sense, it is easy to see how the officer's actions were likely unreasonable.  And, the Supreme Court tells us, a mere touch can effectuate a seizure.  But under the dissent's view, because the officer did not think the struck bystander was in fact the suspect—the officer merely fired into the crowd and hoped his bullet might find the suspect—the bystander was not seized and never even gets to the question of reasonableness.

should, where a seizure has indeed taken place, evaluate each hostage shooting for objective reasonableness on its own merits.[15]

\* \* \*

In sum, because Gannon intentionally (not accidentally) fired his weapon in circumstances that objectively manifested an intent to restrain, Kilnapp was seized when that bullet struck her.

### 2. Reasonableness of Gannon's Use of Force

Having determined that Kilnapp was seized, our analysis normally would turn to the question of whether Gannon's use of force was objectively reasonable.  Because, however, the law regarding the seizure of an unintended target was not clearly established at the time of Kilnapp's shooting, as discussed below, we need not address the reasonableness question.

### D.  Clearly Established

The second prong of the qualified-immunity analysis requires us to determine whether the right at issue was clearly established at the time of the violation.  "A right is clearly established when every reasonable official would have understood that what he is doing violates that right." *Reed v. Campbell County*, 80 F.4th 734, 742 (6th Cir. 2023) (citation modified).  "In assessing whether a right is clearly established, 'we look first to decisions of the Supreme Court, then to our own precedents, and then to decisions of other courts of appeal' in limited circumstances . . . ." *Guptill*, 160 F.4th at 781 (quoting *Hearring v. Sliwowski*, 712 F.3d 275, 280 (6th Cir. 2013)).

We conclude that the seizure of an individual struck by a bullet when an officer intentionally shoots their firearm in circumstances that objectively manifest an intent to restrain was not clearly established at the time of Kilnapp's shooting.  Kilnapp was shot on July 20,

---

[15]John F. Preis, *Officer Intent and Excessive Force*, 86 Ohio St. L.J. 147, 184 (2025) (arguing that the "excessive force doctrine is perfectly capable of giving weight to an officer's" actions in attempting to rescue a hostage who they inadvertently shoot "by evaluating their reasonableness.  When injuries like this are declared nonseizures, a Fourth Amendment reasonableness analysis becomes impossible.").

2020.  Although the principles that guided us to our decision today were largely established in *Brower* and *Brendlin*, *see Gardner*, 641 F.3d at 952–53, the Court's decision in *Torres* crystallized them, as discussed at length above.  *Torres* was decided in 2021, after the incident at issue in this case.  Because *Torres* was crucial to defining the right violated in this case, that right was not clearly established when Kilnapp was shot in 2020.  Kilnapp therefore cannot prevail on the clearly-established-law prong of qualified immunity, and Gannon is entitled to qualified immunity on Kilnapp's Fourth Amendment claim.

## E.  Fourteenth Amendment Claim

The district court did not decide Kilnapp's Fourteenth Amendment claim, reasoning that "[b]ecause . . . the Fourth Amendment applies, there is no need to analyze Plaintiff's alternative claim of a Fourteenth Amendment violation."  R. 77 (D. Ct. Op. 2/13/2025 at 6) (Page ID #3971).  Gannon urges us to grant him judgment on that claim.  D. 12 (Appellant Br. at 35–37).  Because the district court did not reach the issue, we decline to address it in the first instance. *See Freed v. Thomas*, 976 F.3d 729, 741 (6th Cir. 2020) ("While this court has exercised discretion to decide issues on appeal that were not addressed by the district court, 'typically,' we 'will not address issues unless ruled upon by the trial court below.'" (internal citation omitted) (quoting *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 554–55 (6th Cir. 1998))).

## IV.  CONCLUSION

We hold today that when an officer intentionally shoots their firearm in circumstances that objectively manifest an intent to restrain, any individual struck by the bullet is thereby seized, regardless of whether that individual was the officer's specific intended target.  But because the law was not clearly established prior to *Torres*, we **VACATE** the decision of the district court and **REMAND** with instructions to grant Gannon's summary-judgment motion as to the Fourth Amendment claim, to address the Fourteenth Amendment claim, and for further proceedings consistent with this opinion.

---

**CONCURRENCE / DISSENT**

---

BUSH, Circuit Judge, concurring in part, dissenting in part, and concurring in the judgment. I agree that we should vacate and remand for consideration of Kilnapp's Fourteenth Amendment claim. I disagree, however, with the majority that Gannon's conduct violated the Fourth Amendment. In order to find a seizure under the Fourth Amendment, the majority disregards the holding of a prior panel of this circuit and creates a split with at least seven of our sister circuits.

**I.**

"[T]his circuit follows the rule that the holding of a published panel opinion binds all later panels unless overruled or abrogated en banc or by the Supreme Court." *Wright v. Spaulding*, 939 F.3d 695, 700 (6th Cir. 2019). That rule should settle the Fourth Amendment issue. That's because a prior panel of this court held that "[42 U.S.C. §] 1983 claims which seek remuneration for physical injuries *inadvertently inflicted upon an innocent third party* by police officers' use of force while attempting to seize a perpetrator" are not cognizable under the Fourth Amendment "because the authorities [can]not 'seize' any person other than one who was a deliberate object of their exertion of force." *Claybrook v. Birchwell*, 199 F.3d 350, 359 (6th Cir. 2000) (citing *Brower v. County of Inyo*, 489 U.S. 593, 596 (1989)). Kilnapp alleges that Gannon violated her Fourth Amendment rights when he inadvertently injured her while attempting to seize Borden. So *Claybrook* should resolve her claim without need for further discussion.

The majority concludes otherwise. It views *Claybrook*'s Fourth Amendment holding as dicta because "only the [plaintiff's] Fourteenth Amendment claim was actually before the court . . . ." Majority Op. at 13. This conclusion both misreads *Claybrook* and ignores an important aspect of § 1983 jurisprudence. The Supreme Court held that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive

due process, must be the guide for analyzing these claims." *County of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998) (quoting *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality op.)).

Here is the normal order of operations when assessing a § 1983 claim that may implicate the Fourth Amendment: first, the court must decide whether the conduct falls within the ambit of the Fourth Amendment; if the answer is no, then the court proceeds to analyze the Fourteenth Amendment claim. *See, e.g.*, *Estate of George ex rel. George v. Michigan*, 63 F. App'x 208, 211–14 (6th Cir. 2003); *Schaefer v. Goch*, 153 F.3d 793, 796–97 (7th Cir. 1998). But if the challenged conduct does fall within the ambit of the Fourth Amendment, the Fourteenth Amendment claim fails as a matter of law. *See Lewis*, 523 U.S. at 842. So, had the *Claybrook* plaintiff been seized under the meaning of the Fourth Amendment, her Fourteenth Amendment claim would have failed. *Claybrook*'s Fourth Amendment discussion was therefore not dicta—it was a necessary holding on a "threshold issue . . . ." *Id.*; *see also Fisher v. City of Memphis*, 234 F.3d 312, 318–19 (6th Cir. 2000) ("In . . . [*Claybrook*], this Circuit applied *Brower* in determining whether a victim of an errant bullet in a shootout fell within the scope of Fourth Amendment seizure."). This logic contradicts the majority's treatment of *Claybrook*'s Fourth Amendment holding as dicta.

The majority also conflicts with subsequent decisions of this court that have treated *Claybrook* as a binding Fourth Amendment holding. For example, *Fisher v. City of Memphis* reaffirmed and relied on *Claybrook*'s Fourth Amendment holding in reaching its result:

> *Claybrook* emphasized that police officers do seize any person who is a "deliberate object of their exertion of force." Here, Becton's car was the intended target of Defendant's intentionally applied exertion of force. By shooting at the driver of the moving car, he intended to stop the car, effectively seizing everyone inside, including the Plaintiff.

234 F.3d at 318–19 (quoting *Claybrook*, 199 F.3d at 359) (cleaned up). And in *Rodriguez v. Passinault*, we distinguished *Claybrook* while treating it as good law. 637 F.3d 675, 687 (6th Cir. 2011) (distinguishing cases like *Claybrook* "on the basis" of a lack of "intentional acquisition of physical control" of the innocent third party); *id.* at 686 n.5; *see also Buck v. City of Highland Park*, 733 F. App'x 248, 252 (6th Cir. 2018) (treating *Claybrook*'s Fourth Amendment holding as binding). *Fisher* and *Rodriguez* would not have had to distinguish

*Claybrook* if its Fourth Amendment holding was dicta.  Simply put, our cases treat *Claybrook* as binding.  The majority should have been so bound.

Finally, the majority opinion itself belies the majority's argument that *Claybrook*'s Fourth Amendment holding is dicta because "one could excise" it without affecting the disposition of that case.  Majority Op. at 13.  One could also excise roughly half of the majority opinion—Section III.C, to be precise—without affecting Gannon's ultimate entitlement to qualified immunity.  But the majority's Fourth Amendment holding is not dicta.  Neither is *Claybrook*'s.

## II.

The majority contends that even if *Claybrook* would otherwise bind it, *Torres v. Madrid*, 592 U.S. 306 (2021), has effectively overruled *Claybrook*.  Not so.

It is important to delineate what *Torres* did and did not do.  In *Torres*, the Supreme Court held that "a seizure occurs when an officer shoots someone who temporarily eludes capture after the shooting."  *Id.* at 309.  It also emphasized the "distinction between seizures by *control* and seizures by *force*."  *Id.* at 322.  And it explained that while a seizure by control "involves either voluntary submission to a show of authority or the termination of freedom of movement," *id.* at 322, a seizure by force involves "[t]he application of physical force to the body of a person with intent to restrain," *id.* at 309, and it analogized a seizure by force to an arrest, *id.* at 312.  In other words, *Torres* is about timing—it tells us *when* the seizure takes place during the police encounter (when force is applied).  *See id.* at 318 ("We therefore conclude that the officers seized Torres for the instant that the bullets struck her.").

But *Torres* said nothing relevant to this case.  It did not answer the question of whom an officer must intend to restrain—it could not have, because *Torres* dealt with the intentional shooting of a fleeing suspect.  *Id.* at 310.  It did not address accidental injuries to bystanders, hostages, or other third parties.  Nor did it establish a broad new rule of constitutional law that an officer's subjective intent is never part of the Fourth Amendment inquiry.  *See id.* at 317.  In

other words, *Torres* is not about substance—it does not tell us *what* an officer must do to seize a subject.[1]

The majority puts much weight on the following language from *Torres*: "the appropriate inquiry is whether the challenged conduct *objectively* manifests an intent to restrain, for we rarely probe the subjective motivations of police officers in the Fourth Amendment context." *Id.* at 317. But that language cannot bear that weight. Most obviously, the officers in *Torres* intentionally shot the plaintiff. So *Torres* does not address, much less resolve, whether an unintended target can be seized. Additionally, the *Torres* quote indicates that there are at least some situations where an officer's subjective motivation matters under the Fourth Amendment. Simply stated, the majority overreads *Torres*.

Furthermore, although *Claybrook* "predates" and therefore "fails to take account of" *Brendlin v. California*, 551 U.S. 249 (2007), Majority Op. at 14, *Brendlin* does not resolve this case or overrule *Claybrook*. The majority implicitly agrees; otherwise, it would have found the law to be clearly established at the time of the shooting. Regardless, it is worth explaining why in more detail.

In *Brendlin*, the Supreme Court held what it had long stated in dicta in previous cases: a traffic stop entails the seizure of all passengers in the stopped vehicle. 551 U.S. at 255–56. There are three reasons why this holding is not inconsistent with *Claybrook*.

*First*, unintended-target cases such as *Claybrook* are logically distinguishable from passenger cases such as *Brendlin*. An officer who stops a vehicle knows he will stop every passenger inside because it is impossible to stop a car but not all its passengers.[2] *See Fisher*, 234 F.3d at 318–19. So each passenger is a direct object of the seizure. *Id.* In unintended-target

---

[1]Indeed, in this regard, *Torres* broke no new ground. The Court just applied the holding in *Hodari D.* that "the mere grasping or application of physical force with lawful authority [i]s an arrest, whether or not it succeeded in subduing the arrestee." *Torres v. Madrid*, 592 U.S. 306, 311 (2021) (quoting *California v. Hodari D.*, 499 U.S. 621, 624 (1991)) (quotation marks omitted).

[2]This same logic resolves the hypothetical in the majority opinion's footnote 14. An officer who indiscriminately shoots into a densely packed crowd of people necessarily intends to put the whole crowd within the range of the shot at risk. So the crowd itself is the direct object of the seizure, even though the officer "hoped his bullet might find the suspect . . . ." Majority Op. at 20 n.14.

cases, on the other hand, the officer intends to seize only one person, but instead accidentally seizes someone else—the bystander. *Claybrook*, 199 F.3d at 355, 359. The seizure of the bystander is purely accidental, whereas the seizure of all the vehicle passengers is deliberate. So *Brendlin* does not overrule the holding in *Claybrook*.

*Second*, the caselaw treats passenger cases as distinguishable from unintended-target cases. *Brendlin* built itself on a long and detailed line of Supreme Court cases establishing that traffic stops constitute seizures. *See* 551 U.S. at 255–58. No such line exists for unintended-target cases, and courts have treated them as separate issues. The strongest evidence for this is that at the time *Brendlin* was decided, all nine circuits that had addressed the passenger-seizure issue had held that passengers are seized under the Fourth Amendment during traffic stops. *Id.* at 258–59 (collecting cases). But many of those same circuits held—without finding any contradiction—that unintended targets (usually bystanders or hostages) accidentally shot by officers who intended to shoot suspects were not seized within the meaning of the Fourth Amendment.[3] None of these circuits, including our own, found any inconsistency between providing Fourth Amendment protection to a passenger during a traffic stop but not to an unintended target accidentally struck by a police officer's bullet during an exchange of gunfire. And to whatever extent inconsistency exists, *Brendlin* did not address it, let alone resolve it.

---

[3]*Compare Landol-Rivera v. Cruz Cosme*, 906 F.2d 791, 794–95 (1st Cir. 1990) (applying *Brower* to find that a hostage who was accidentally injured when police shot at a robber was not seized under the Fourth Amendment), *Rucker v. Harford County*, 946 F.2d 278, 281 (4th Cir. 1991) (holding *Brower* "directly foreclosed" the Fourth Amendment claim of a bystander accidentally shot by an officer who intended to hit a fleeing suspect), *Claybrook v. Birchwell*, 199 F.3d 350, 359 (6th Cir. 2000) (relying on *Brower* and holding the Fourth Amendment doesn't apply to "physical injuries *inadvertently inflicted upon an innocent third party* by police officers' use of force while attempting to seize a perpetrator"), *Moore v. Indehar*, 514 F.3d 756, 760 (8th Cir. 2008) (holding that "bystanders are not seized for Fourth Amendment purposes when struck by an errant bullet in a shootout"), *and Childress v. City of Arapaho*, 210 F.3d 1154, 1156–57 (10th Cir. 2000) (applying *Brower* to find that a hostage who was accidentally injured when police shot at a suspect was not seized under the Fourth Amendment), *with United States v. Kimball*, 25 F.3d 1, 5 (1st Cir. 1994) (explaining that "[w]hen a police officer effects an investigatory stop of a vehicle, *all* occupants of that vehicle are subjected to a seizure, as defined by the Fourth Amendment"), *United States v. Rusher*, 966 F.2d 868, 874 n.4 (4th Cir. 1992) (stating that passengers in a car that was subject to a traffic stop had been seized within the meaning of the Fourth Amendment), *United States v. Perez*, 440 F.3d 363, 369 (6th Cir. 2006) (holding that a traffic stop "affects the Fourth Amendment interests of all the occupants" of the car, including a passenger), *United States v. Ameling*, 328 F.3d 443, 446–47 & n.3 (8th Cir. 2003) (allowing a passenger to make a Fourth Amendment challenge to the admissibility of evidence gleaned from an allegedly illegal traffic stop), *and United States v. Erwin*, 875 F.2d 268, 270 (10th Cir. 1989) ("[W]e see no reason why a person's Fourth Amendment interests in challenging his own seizure should be diminished merely because he was a passenger, and not the driver, when the stop occurred.").

*Third*, as *Torres* recognized, *Brendlin* was a seizure-by-control case with little relevance to seizure-by-force cases like the one before us. *Torres*, 592 U.S. at 322.

In sum, the majority relies on a patchwork of general statements and selected language from Supreme Court cases that are not really on point. A little bit of equivocal language from *Torres* here, and a lot of reliance on *Brendlin* there—but that is not enough to overrule *Claybrook* or to avoid the circuit split that the majority creates.

## III.

The majority holds, for the first time, that an officer's subjective intent has no bearing on whether a Fourth Amendment seizure occurred. In so doing, the majority strands our circuit on the wrong side of a split—with seven of our sister circuits opposed.

In *Rucker v. Harford County*, the Fourth Circuit held that the Fourth Amendment's protection against unreasonable seizures does not extend to unintentionally injured bystanders. 946 F.2d 278, 218 (4th Cir. 1991). Three other circuits have agreed in unpublished opinions. *See Singleton v. Casanova*, No. 22-50327, 2024 WL 2891900, at *16 (5th Cir. June 10, 2024); *Arruda ex rel. Arruda v. County of Los Angeles*, 373 F. App'x 798, 799 (9th Cir. 2010); *Emanuel v. District of Columbia*, 224 F. App'x 1, 2 (D.C. Cir. 2007) (per curiam); *see also United States v. Lockett*, 919 F.2d 585, 590 n.4 (9th Cir. 1990). Our sister circuits are also unanimous in holding that hostages unintentionally injured by officers are not seized under the Fourth Amendment—and that the officer's lack of subjective intent is the decisive factor. *See Hawatmeh v. City of Henderson*, 159 F.4th 591, 600 (9th Cir. 2025); *Childress v. City of Arapaho*, 210 F.3d 1154, 1156–57 (10th Cir. 2000); *Medeiros v. O'Connell*, 150 F.3d 164, 169 (2d Cir. 1998); *Landol-Rivera v. Cruz Cosme*, 906 F.2d 791, 795–96 (1st Cir. 1990).

*Torres* does not appear to have changed this landscape. In *Singleton v. Casanova*, a post-*Torres* case, the Fifth Circuit explained that "with excessive force claims, each plaintiff seeking relief must establish that the defendant-officer intended to use force against his or her person, not someone else's." 2024 WL 2891900, at *16. Finding that "[u]ltimately, the question is one of intent," the court remanded for further consideration of whom the officer targeted when he was firing. *Id.* at *17–18. In other words, the dispositive issue was the officer's subjective intent.

The same applies in hostage cases.  In *Hawatmeh v. City of Henderson*, another post-*Torres* case, the Ninth Circuit held that a hostage accidentally shot by an officer who intended to hit the suspect was not seized under the Fourth Amendment because the officer lacked the requisite intent to restrain the hostage.  159 F.4th at 600.  Relying on *Torres*, the Ninth Circuit held that the intent to restrain is not present when the officer does not intend to apply force to the innocent third party.  *Id.* at 600–01 (citing *Torres*, 592 U.S. at 317).  So the majority's assertion that its rule "would lead to more uniform results," Majority Op. at 18, is deeply ironic.  Every circuit to have considered the issue at hand, including our own in *Claybrook*, has held that there is no Fourth Amendment seizure.  The only contrary holding is the majority's opinion.

The majority insists that rather than creating a split, it announces a rule that harmonizes disparate caselaw.  But no such disharmony exists.  Take the majority's discussion of several canine-bite cases.  These cases are perfectly reconcilable if we recognize the legitimate role of the officer's subjective intent in the Fourth Amendment inquiry.

For example, *Vathekan v. Prince George's County* is a mistaken-identity case.  154 F.3d 173 (4th Cir. 1998).  The officer intended the canine to bite a person in the room where it had been sent—the officer was simply mistaken in his belief that the person in the room was the suspect.  *Id.* at 178.  Existing caselaw that recognizes the role of subjective intent readily distinguishes unintended-target cases from mistaken-identity cases.  *Landol-Rivera*, 906 F.2d at 796 (explaining that "mistakes of identity" are different from "inadvertent 'acquisitions of physical control'" because "[i]t is intervention directed at a specific individual that furnishes the basis for a Fourth Amendment claim"); *Medeiros*, 150 F.3d at 169; *Moore*, 514 F.3d at 760.  In unintended-target cases, the officer does not intend to apply means to the seized individual.  In mistaken-identity cases, the officer intentionally applies means to the seized individual, and is merely mistaken about to whom he has applied those means.  *Vathekan* and *Rogers v. City of Kennewick*, 206 F. App'x 657 (9th Cir. 2006), are examples of mistaken-identity cases.[4]

---

[4]This court's decision in *Dunigan v. Noble*, 390 F.3d 486 (6th Cir. 2004), is essentially an accidental-discharge case.  There, the officer had not given the canine a bite command when it bit the bystander.  *Id.* at 492.  In cases like *Dunigan*, where the application of means is purely accidental, there is no seizure, and the Supreme Court has recognized that since *Brower*, 489 U.S. at 596–97.

Contrary to the majority's view, the caselaw is in fact harmonious. Accounting for subjective intent is that "intelligible principle [that] categorically distinguish[es] the mistaken-identity-shooting cases from the hostage-shooting and bystander-shooting cases." Majority Op. at 18–19; *see Landol-Rivera*, 906 F.2d at 796 (distinguishing unintended-target cases from mistaken-identity cases on the basis of subjective intent); *Medeiros*, 150 F.3d at 169 (same); *Moore*, 514 F.3d at 760 (same).

What will create disharmony is the majority's adoption of a rule that squarely conflicts with seven other circuits. *See Hawatmeh*, 159 F.4th at 600; *Singleton*, 2024 WL 2891900, at *16; *Moore*, 514 F.3d at 760; *Emanuel*, 224 F. App'x at 2; *Childress*, 210 F.3d at 1156–57; *Medeiros*, 150 F.3d at 169; *Rucker*, 46 F.2d at 218; *Landol-Rivera*, 906 F.2d at 795–96.[5] Perhaps sensing that an extraordinary break with our sister circuits requires extraordinary justification, the majority defends its new rule by arguing that a subjective-intent inquiry is so difficult as to be functionally impossible, because we cannot simply "get into Gannon's head at the time of the shooting." Majority Op. at 19. This impossibility will be news to our sister circuits, who have been analyzing the subjective intent of officers in Fourth Amendment cases for decades.[6] It will also be news to litigants in intentional tort suits where a government employee claims qualified immunity for good-faith actions taken within the scope of employment, *see, e.g.*, *Bletz v. Gribble*, 641 F.3d 743, 757 (6th Cir. 2011), or where subjective

---

[5]The Eighth Circuit recently disclaimed the role of subjective intent in the seizure inquiry. *See Hight v. Williams*, ---F.4th----, 2026 WL 90996, at *1–2 (8th Cir. Jan. 13, 2026). But even under that circuit's test, Gannon did not seize Kilnapp. The Eighth Circuit held that in bystander-shooting cases, "[t]he intent does not transfer because the force used must be 'intentionally applied' to whomever or whatever the officer is trying to seize." *Id.* at *3 (quoting *Torres*, 592 U.S. at 317). It beggars belief that a reasonable person would think that Gannon—a greenhorn police officer confronting an armed suspect in total darkness—intended to shoot Kilnapp rather than Borden. Under the Eighth Circuit's test, because Borden was the only person Gannon "conceivably intended to restrain," no seizure occurred. *Id.* The majority takes a quite different tack. Though it styles it an objective test, the majority is really announcing a transferred-intent doctrine. *See* Majority Op. at 12–13; *cf.* Restatement (Third) of Torts § 110 (Am. L. Inst., Tentative Draft 2015). Under the majority's new rule, whether the officer objectively manifested an intent to restrain *the person who was actually shot* is irrelevant. The majority therefore splits us with the Eighth Circuit as well, albeit along different lines.

[6]The majority's only defense on the circuit-split point is that many of our sister circuits' cases "were decided before *Torres*, and many before even *Brendlin*." Majority Op. at 14 n.5. But the majority's retort begs the question of whether *Torres* meaningfully bears on bystander-shooting cases. For the reasons laid out in Section II of this dissent, it does not. As for *Brendlin*, the majority implicitly concedes that it was insufficient to resolve bystander-shooting cases; otherwise, its analysis in Section III.D would go the other way. So *Brendlin*'s timing is irrelevant.

intent to injure is an element of the tort, *see, e.g.*, *Broyles v. Kasper Mach. Co.*, 517 F. App'x 345, 353 (6th Cir. 2013).  And it will be news to the juries whom we usually charge with making these difficult factual determinations.

## IV.

The majority's Fourth Amendment holding disregards binding precedent and creates a split with seven of our sister circuits.  The district court's judgment should be vacated simply because Gannon's shooting of Kilnapp did not violate the Fourth Amendment.

Future panels will need to determine whether the majority's Fourth Amendment holding runs afoul of *Claybrook*.  It is the rule in our circuit that, "when a later decision of this court conflicts with one of our prior published decisions, we are still bound by the holding of the earlier case." *Darrah v. City of Oak Park*, 255 F.3d 301, 310 (6th Cir. 2001).  Therefore, if a future panel determines that there is such a conflict, it must follow *Claybrook*.  *See EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 580 (6th Cir. 2018); *M & C Corp. v. Erwin Behr GmbH & Co., KG*, 508 F. App'x 498, 504 (6th Cir. 2012) (Moore, J., concurring in the judgment).